**S.P.A. GIACOMINI, formerly known as Alberto Giacomini Rubinetterie, S.p.A., Appellant,**

**v.**

**Angela LAMPING, Clifford T. Lamping, and Central Plumbing & Electric Supply Co., Appellees.**

**No. 13–00–472–CV.**

Court of Appeals of Texas, Corpus Christi.

March 1, 2001.

John W. Weber, Jr., Rosemarie Kanusky, W. Wendall Hall, Fulbright & Jaworski, San Antonio, for Appellant.

Charlie J. Cilfone, Roger W. Hughes, Adams & Graham, Harlingen, Keith N. Uhles, Royston, Rayzor, Vickery & Williams, Brownsville, David G. Oliveira, W. Michael Fisher, Roerig, Oliveira & Fisher, Brownsville, Richard G. Roth, Law Office of Richard Roth, Edinburg, Victor M. Carrera, Roger Reed, Reed & Carrera & Mclain, L.l.p., McAllen, Gina M. Benavides, Harlingen, for Appellee.

Before Justices DORSEY, HINOJOSA, and CASTILLO.

## OPINION

Opinion by Justice DORSEY.

Giacomini Rubinetterie, S.p.A. ("Giacomini") brings this accelerated interlocutory appeal of a Hidalgo County district court's order denying its special appearance. *See* TEX.CIV.PRAC. & REM.CODE ANN. § 51.014(a)(7) (Vernon Supp.2001); TEX. R.CIV.P. 120a. Giacomini contends that the court lacks personal jurisdiction. We affirm the trial court's denial of Giacomini's special appearance.

The facts of this appeal are not contested. Angela and Clifford Lamping, residents of Hidalgo County, sued a group of defendants including Giacomini for injuries Clifford sustained when an explosion occurred in their home. Clifford was in bed when the explosion happened. He sustained catastrophic injuries including burns over 50% of his body. The Lampings contend that the explosion was caused by an open, uncapped gas valve that had been installed in the house. Giacomini manufactured the gas valve.

Giacomini filed a special appearance contesting the trial court's exercise of personal jurisdiction over it. Attached to the special appearance was the affidavit of Alberto Giacomini, owner of Giacomini, S.p.A. In his affidavit, he stated that Giacomini, S.p.A. is an Italian corporation with offices in Italy. It has no offices in Texas, conducts no business in Texas, has no property or bank accounts in Texas, has entered into no contracts with parties in Texas, and has no other contacts with the State of Texas.

At the heart of this case is the method of distribution of Giacomini's gas valves in Texas. Giacomini manufactures its products in Italy. It sells its valves to distributors in the United States, but did not sell them to any Texas corporation, and does not have any distributors that are Texas residents. The distributors that it does have are not "owned by, related to, or controlled by Giacomini, S.P.A.," and Giacomini has no kind of franchise, licensing or distributorship agreements with them.

In the usual course of business, a distributor contacts Giacomini, S.p.A. either by telephone, fax or e-mail, and places a purchase order for valves or other products. The distributor specifies a location where Giacomini should ship its order. Two of Giacomini's distributors, B & K of Illinois (B & K) and Pegler, Ltd. of England, occasionally have their valves shipped to the Port of Houston. Giacomini ships them either C.I.F. or F.O.B. The distribu-

tors are free to market the valves in any manner, and may charge any price.

Attached to the plaintiff's response was Giacomini's answers to interrogatories. Some of those answers fleshed out the relationship between Giacomini and its distributors. There, Giacomini stated that the only goods it sent to the Port of Houston were shipped C.I.F. to B & K, and B & K had a broker pick up the delivery. Giacomini stated that it had no knowledge regarding whether the goods sent to Houston were intended to be distributed in Texas.

The Lampings also attached discovery responses from B & K Industries. B & K stated that it has been purchasing valves from Giacomini for around 10 years. It also stated that it currently receives four to six containers per year from Giacomini in Houston, shipped CIF. A container carries 65,000 to 85,000 products (*i.e.*, 250,000 products per year delivered to Houston). B & K stated that Giacomini refers to B & K and three other U.S. companies as "distributors," although there is no written agreement regarding the distributorship relationship. Rather, there is an understanding that Giacomini will sell directly only to those companies.

Also attached to the plaintiff's response was the affidavit of Richard Kuhlman, Senior Executive Vice President for B & K Industries, Inc. It stated:

> Giacomini is aware that B & K Industries, Inc. distributes gas valves it purchases from Giacomini nationwide in the United States, including the state of Texas through B & K's active marketing force. In fact, Giacomini expects B & K to distribute valves nationwide. In 1999 alone, B & K, Industries, Inc., purchased over 3,000,000 valves from Giacomini, S.p.A. Of those valves, many were purchased for distribution in the State of Texas. Giacomini, S.p.A. is ful-

ly aware of B & K, Industries, Inc.'s distribution efforts and sales of gas valves in the State of Texas. B & K is one of four distributors of gas valves in the United States of Giacomini. Other Giacomini distributors also sell Giacomini products in Texas.

Giacomini moved to strike Kuhlman's affidavit. The trial court denied his motion. After hearing arguments, the trial court denied Giacomini's special appearance. Giacomini brings this interlocutory appeal of that order.

## OBJECTIONS TO KUHLMAN'S AFFIDAVIT

### A. Timeliness

■ Giacomini objected to the affidavit of Richard Kuhlman and moved the court to strike the affidavit on two bases. First, Giacomini argues that the trial court abused its discretion by failing to strike the affidavit because it was not filed timely. We disagree.

Texas Rule of Civil Procedure 120a states that:

> The court shall determine the special appearance on the basis of the pleadings, and any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony. The affidavits, if any, shall be served at least seven days before the hearing, shall be made on personal knowledge, shall set forth specific facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify.

TEX.R.CIV.P. 120a(3). The following paragraph of that rule states that "should it appear from the affidavits of a party opposing the motion that he cannot ... present by affidavit facts essential to justify his opposition, the court may order a continuance to permit affidavits to be obtained or

depositions to be taken or discovery to be had or may make such other order as is just." *Id.*

No testimony was taken at the hearing on Giacomini's special appearance, only arguments of counsel. The court stated that it was refusing to strike Kuhlman's affidavit because it wanted to consider all the information available. However, the court offered to give Giacomini time to respond. Giacomini declined that opportunity, stating that it did not need more time to respond to Kuhlman's affidavit because "all the facts are set out in Mr. Giacomini's affidavit." After that, Giacomini did not re-urge his objection to timeliness. We hold that the trial court did not abuse its discretion in considering the late-filed affidavit, and regardless of that, Giacomini waived his complaint regarding the timeliness of Kuhlman's affidavit by going forward with the hearing when given the opportunity for a continuance. *Cf. Owens–Corning Fiberglas Corp. v. Malone,* 972 S.W.2d 35, 43 (Tex.1998) ("Evidentiary rulings are committed to the trial court's sound discretion."); *Barraza v. Eureka Co.,* 25 S.W.3d 225, 228 (Tex.App.—El Paso 2000, pet. denied) ("Rulings concerning the admission or exclusion of summary judgment evidence are reviewed under an abuse of discretion standard."); *see also Potkovick v. Regional Ventures, Inc.,* 904 S.W.2d 846, 850 (Tex.App.—Eastland 1995, no writ) (inferring that a trial court has discretion to consider a late-filed affidavit under Rule 120a).

### B. Lack of Personal Knowledge

 Next, Giacomini contends that Kuhlman's affidavit was not based on personal knowledge. We apply the abuse of discretion standard to the trial court's decision regarding admissibility of the affidavit. *See Barraza,* 25 S.W.3d at 228. Specifically, Giacomini contends that Kuhlman cannot have personal knowledge regarding

what Giacomini knows about B & K's distribution processes. Kuhlman states in his affidavit that Giacomini is "aware" that B & K distributes the gas valves in the U.S. nationwide and in Texas, that Giacomoni "expects" B & K to distribute the valves nationwide, and that Giacomini is "fully aware" of B & K's distribution efforts in Texas.

However, Kuhlman's affidavit also sets forth specific facts showing that such information is within his personal knowledge. Kuhlman stated that he is a Senior Executive Vice President for B & K Industries, and has worked for the company for approximately 30 years. He also stated that B & K orders valves from Giacomini on a regular basis and has been a distributor of Giacomini's products for over ten years. He also stated that B & K currently receives approximately 250,000 products annually from Giacomini at the Port of Houston alone, and purchased over 3 million valves from Giacomini in 1999.

Judging from the volume of products imported, B & K maintains a significant business relationship with Giacomini. Also, B & K has a longstanding relationship with Giacomini, as Kuhlman testified that it had been ongoing for ten years. As a senior executive at B & K and as someone who has worked with the company for 30 years, Kuhlman is competent to testify regarding the business arrangement between B & K and one of its major suppliers. Thus, Kuhlman set forth specific facts showing affirmatively that he is competent to testify as required by Rule 120a(3). *See* Tex.R.Civ.P. 120a(3).

Moreover, the facts contained in his affidavit were readily controvertible. *Cf.* Tex. R.Civ.P. 166a(c) (stating that summary judgments may be based on testimony of an interested witness when it is, among other things, susceptible of being readily

controverted). In fact, Giacomini did not controvert these statements in its own affidavit except to say that it does not control any part of the manner of distribution once it has sold the valves to a distributor and that the distributors do not tell Giacomini where the products are going when the products leave the dock. In its interrogatory responses, Giacomini stated that it "has no way of knowing whether or not it is the intent of B & K to distribute those goods in the State of Texas, or where said goods will be distributed by them." These statements, though, do not contradict Kuhlman's statements about Giacomini's knowledge and expectations regarding B & K's distribution of its products. For all these reasons, we hold the trial court did not abuse its discretion in refusing to strike the affidavit. *Cf. M.G.M. Grand Hotel, Inc. v. Castro*, 8 S.W.3d 403, 407 (Tex.App.—Corpus Christi 1999, no pet.) (holding that corporate officer had personal knowledge of corporation's contacts with another state). Having resolved the questions regarding the affidavit, we now turn to the substance of this appeal.

### PERSONAL JURISDICTION

■ A Texas court may assert personal jurisdiction over a nonresident defendant only if the requirements of both the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and the Texas long-arm statute are satisfied. *CSR Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex.1996); *see* U.S. CONST. amend. XIV, § 1; TEX.CIV.PRAC. & REM.CODE ANN. § 17.042 (Vernon 1997). The long-arm statute allows a court to exercise personal jurisdiction over a nonresident defendant that does business in Texas. TEX.CIV.PRAC. & REM CODE ANN. § 17.042; *CSR Ltd.*, 925 S.W.2d at 594. "Doing business" means: (1) contracting by mail or otherwise with a Texas resident when either party is to perform the contract in whole or in part in

the State of Texas; (2) committing a tort in whole or in part in this state; (3) recruiting Texas residents, directly or through an intermediary located in this state, for employment inside or outside the state; and (4) "other acts." TEX.CIV.PRAC. & REM.CODE ANN. § 17.042. The Texas Supreme Court has repeatedly stated that the "other acts" may include any set of actions that will satisfy the federal constitutional due process requirements. *CSR, Ltd.*, 925 S.W.2d at 594; *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991). "Consequently, the requirements of the Texas long-arm statute are satisfied if the exercise of personal jurisdiction comports with federal due process limitations." *CSR, Ltd.*, 925 S.W.2d at 594. The United States Supreme Court has held that a state court can take personal jurisdiction over a defendant only if (1) it has some minimum, purposeful contacts with the state, and (2) the exercise of jurisdiction will not offend traditional notions of fair play and substantial justice. *See Asahi Metal Indus. v. Superior Court*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

### A. Minimum Contacts

■ In order to have minimum contacts with a forum state sufficient to confer personal jurisdiction, a nonresident defendant must have purposefully availed itself of the privileges and benefits of conducting business in the foreign jurisdiction. *Burger King*, 471 U.S. at 475–76, 105 S.Ct.

2174; *CSR*, 925 S.W.2d at 594; *Happy Industrial Corp. v. American Specialties, Inc.*, 983 S.W.2d 844, 847 (Tex.App.—Corpus Christi 1998, pet. dism'd w.o.j.). A defendant should not be subject to the jurisdiction of a foreign state's court based upon "random," "fortuitous," or "attenuated" contacts. *CSR*, 925 S.W.2d at 595 (quoting *Burger King*, 471 U.S. at 475–76, 105 S.Ct. 2174). Minimum contacts are particularly important when the defendant is from a different country because of the unique and onerous burden placed on a party called upon to defend a suit in a foreign legal system. *Id.*

■ A defendant's contacts with a forum can give rise to either general or specific jurisdiction. General jurisdiction is present when a defendant's contacts are continuous and systematic, thus the forum may exercise personal jurisdiction over the defendant even if the cause of action did not arise from or relate to activities conducted within the forum state. *CSR*, 925 S.W.2d at 595; *see Charles H. Schlobohm v. Rolf L. Schapiro*, 784 S.W.2d 355, 357 (Tex.1990). A nonresident must have conducted more substantial activity in the forum state for the state to exercise general jurisdiction than for it to exercise specific jurisdiction. *CSR*, 925 S.W.2d at 595; *Happy Indus. Corp.*, 983 S.W.2d at 847. Conversely, specific jurisdiction may be exercised if the defendant's alleged liability arises from or is related to its activity conducted within the forum state. *CSR*, 925 S.W.2d at 595. In this case, the question is whether Giacomini's activities are sufficient to establish specific jurisdiction.

As the Texas Supreme Court noted in *CMMC v. Salinas*, in *World–Wide Volkswagen,* the United States Supreme Court stated a basis for personal jurisdiction that has come to be referred to as the stream-of-commerce doctrine:

> [I]f the sale of a product of a manufacturer or a distributor ... is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others. The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivered its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State.

*World–Wide Volkswagen,* 444 U.S. at 297–98, 100 S.Ct. 559; *CMMC,* 929 S.W.2d 435, 437–38 (Tex.1996).

Seven years later, Justice O'Connor, speaking for a four-member plurality, wrote that the rule in *World–Wide Volkswagen* did not allow an exercise of personal jurisdiction to be based on the defendant's mere act of placing the product in the stream of commerce, but the nonresident defendant must have done something else to have purposefully availed itself of the market in the forum State. She stated:

> The "substantial connection" between the defendant and the forum State necessary for a finding of minimum contacts must come about by an action of the defendant purposefully directed toward the forum State. The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State,

advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

*Asahi*, 480 U.S. at 110–12, 107 S.Ct. 1026 (citations omitted). Justice Brennan expressed the opposing view in stating:

> I see no need for [a showing of additional conduct directed toward the forum]. The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise. Nor will the litigation present a burden for which there is no corresponding benefit. A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State, and indirectly benefits from the State's laws that regulate and facilitate commercial activity. These benefits accrue regardless of whether that participant directly conducts business in the forum State, or engages in additional conduct directed toward that State.

*Asahi*, 480 U.S. at 117, 107 S.Ct. 1026 (Brennan, J., concurring in part)(footnote omitted).

The Texas Supreme Court has "not taken sides" in the *Asahi* debate over the stream-of-commerce doctrine yet, as it has not reached a case similar enough factually. *CMMC*, 929 S.W.2d at 438–39. Likewise, we find the instant case clearly falls on the side of imposing jurisdiction. This is not a case of "placement of a product into the stream of commerce, without more." *Asahi*, 480 U.S. at 112, 107 S.Ct. 1026. Rather, Giacomini's actions are purposefully directed at the Texas market. Giocomini ships mass quantities of its products to a distributor in Texas, fully aware that the distributor will be marketing significant quantities to customers in Texas. Giocomini's contacts with Texas amount to a regular and anticipated flow of products from manufacturer to distribution to retail sale. *See Asahi*, 480 U.S. at 117, 107 S.Ct. 1026. Thus, regardless of which side of the *Asahi* debate is taken, Giacomini's actions amount to minimum contacts sufficient to justify the exercise of personal jurisdiction.

The trial court's exercise of personal jurisdiction over Giacomini is also consistent with Texas precedent in this area. In *CMMC v. Salinas*, the Texas Supreme Court determined that a Texas trial court could not assume personal jurisdiction over a French manufacturer merely because the manufacturer knew its allegedly defective product would be shipped to Texas. *CMMC*, 929 S.W.2d at 436. In that case, a small winery in Texas purchased an allegedly defective winepress from an equipment distributor that was a New York corporation. *Id.* The distributor ordered the winepress from a French manufacturer, CMMC. *Id.* The French manufacturer shipped the winepress to the winery FOB the Port of Houston, in accordance with the New York distributor's instructions. *Id.* The Texas winery took title to the winepress in Houston and paid for transportation to the winery. *Id.* The French manufacturer had no direct contact with the winery. *Id.* at 436–37.

The French manufacturer had no other contacts with Texas. *Id.* It was a French corporation that sold wine production equipment primarily in Europe. *Id.* at 437. It had sold some equipment in the U.S., including a direct sale to another winery in Texas. *Id.* It did not directly market or advertise its equipment in the U.S., but did provide promotional material to its distributor. *Id.* at 436–37. Customers could buy its products either directly or through a distributor. *Id.* at 436.

The New York distributor had no offices in Texas and had only made three or four sales of equipment in Texas for the prior ten year period. *Id.* at 437. It had no contractual arrangements with the French manufacturer, and the two companies shared no employees. *Id.* at 436. The distributor advertised the manufacturer's products, but the manufacturer did not specifically authorize or approve the ads. *Id.* The distributor's marketing efforts were primarily directed toward California, but it also advertised in nationally circulated wine industry magazines. *Id.* at 437.

The Texas Supreme Court found that the French manufacturer had insufficient contacts to justify a Texas courts' exercising personal jurisdiction over it. *Id.* at 437, 439–40. It stated:

> [The French manufacturer]'s wine-producing equipment did not regularly find its way to Texas. Neither [the French manufacturer] nor [the distributor] made any effort to market [the manufacturer's] equipment in Texas, other than by advertisements in magazines with national circulation. [The Texas winery's] purchase was an isolated event. [The distributor] did not contact [the winery]; [the winery] contacted [the distributor]. [The winery] never had any contacts at all with [the French manufacturer]. [The manufacturer's] mere knowledge that its winepress was to be sold and used in Texas and its wiring the machine for use in the United States were not sufficient to subject [it] to the jurisdiction of Texas courts. This evidence simply does not show that [the manufacturer] designed products for use in Texas, or that it made any effort to market them here, or that it took any other action to purposely avail itself of this market. Even Justice Brennan's view of the stream-of-commerce doctrine would not allow jurisdiction absent a "regular and anticipated flow of products from manufacture to distribution to retail sale." There is no flow of products from [the manufacturer] to Texas; there is scarcely a dribble.

*Id.* at 439.

Giacomini's case is different. The sale of Giacomini's products in Texas to Texas residents is not an isolated event. Giacomini's gas valves *did* regularly find their way to Texas. Giacomini's distributor *did* make efforts to market the gas valves in Texas. The evidence showed that Giacomini sold to B & K over 3,000,000 products in one year, which it, in turn, sold throughout the United States, including in Texas. Approximately 250,000 of Giacomini's products are currently shipped to the Port of Houston annually. An officer of Giacomini's distributor stated that Giacomini was aware that its products were being distributed in Texas, not only by B & K, who sold "many" of the 3,000,000 valves it purchased in 1999 in Texas, but also by Giacomini's other U.S. distributors. This is a far cry from the isolated sales in Texas made by the French wine equipment manufacturer in *CMMC.* This substantial, regular and continuing flow of products from Giacomini to B & K, with roughly 250,000 products being shipped directly to Texas, and a substantial number of the products being regularly sold in Texas, distinguishes this case from *CMMC.*

We also find this case distinguishable from *CSR Ltd. v. Link,* 925 S.W.2d 591 (Tex.1996). There, the Texas Supreme Court held that an Australian corporation who sold asbestos to another company that immediately shipped the asbestos to Houston, Texas, did not have minimum contacts with the State of Texas for the exercise of personal jurisdiction. *Id.* at 595–96. Title to the asbestos was transferred in Australia. *Id.* at 595. The Australian company neither "created, controlled, or employed" the distribution system that brought the asbestos to Texas. *Id.*

The plaintiffs argued that because the company that bought the asbestos and shipped it to Houston was the Australian company's only agent that sold asbestos in the United States, the Australian company should be subject to Texas jurisdiction based on a theory of foreseeability. *Id.* Rejecting that approach, the Texas Supreme Court noted that "[a]lthough foreseeability is a factor to consider in a minimum contacts analysis, foreseeability alone will not support personal jurisdiction." *Id.* Rather, "[t]he defendant must take an action 'purposefully directed toward the forum state' to be subject to the jurisdiction of its courts." *Id.* (quoting *Asahi,* 480 U.S. at 112, 107 S.Ct. 1026). The court reiterated that " 'a defendant's awareness that the stream of commerce may or will sweep the product into the forum state does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.' " *Id.* (quoting *Asahi,* 480 U.S. at 112, 107 S.Ct. 1026). Ultimately, the court said that "there must be some indication that CSR intended to serve the Texas market." *Id.*

Again, significant distinctions exist between that case and the present case. Here, there are indications that Giacomini intended to serve the Texas market. Giacomini shipped hundreds of thousands of products to Texas and sold to distributors with knowledge that many of its products would be sold in Texas. In a sense, Giacomini "employed" the distribution system that brought its products to Texas.

Likewise, Giacomini's situation is distinguishable from that presented to this Court in *Happy Indus. Corp. v. American Specialties, Inc.,* 983 S.W.2d 844 (Tex. App.—Corpus Christi 1998, pet. dism'd w.o.j.). There, a Texas corporation purchased two commercial embroidery machines manufactured by Happy Industries, a Japanese corporation ("Happy"). *Id.* at 846–47. The Texas corporation first saw the machines at a trade show held in Dallas, Texas, where they were being promoted and advertised by another company called Data–Stitch, Inc. *Id.* at 847. Data–Stitch indicated to the Texas corporation that the machines were manufactured by a Japanese corporation ("Happy"), and represented that it was actually an agent for Happy. *Id.* The Texas corporation bought two machines from Data–Stitch, and they were installed by Data–Stitch. *Id.* The machines that were purchased were indeed manufactured by the Japanese manufacturer, Happy. *Id.*

However, Happy produced evidence showing that it had no contact whatsoever with either Data–Stitch or another company, TexMac, that had also been represented to the plaintiff as an authorized Happy distributor. *Id.* at 849. Rather, Happy sold its products to a company called Itochu, and then it had no further authority over the manner the product was distributed. *Id.* This Court stated:

> Happy's contacts with Texas arose from ASI's purchase of two commercial embroidery machines. Although Happy manufactured the machines ASI bought them from Data–Stitch who in turn received them from Texmac. Happy had

no agency relationship or other affiliation with either company. The [plaintiff's] affidavits refer to sales of other Happy embroidery machines in Texas and other states, but there is no evidence to show how those alleged machines reached Texas due to any purposefully directed activities of Happy or any other link with the business entity. *Id.* at 851 (citations omitted). Ultimately, this Court held that Happy did not have minimum contacts with Texas because the plaintiff failed "to show any nexus between its acquisition of the two commercial embroidery machines and any act or consummation of a transaction by Happy in Texas." *Id.*

Giacomini's situation is far different from that in Happy, as well. Rather than the placement of *two* products in the State of Texas, Giacomini has regularly shipped hundreds of thousands to the state with the awareness that many were going to be sold inside the state. Also, Happy had no contacts with the State of Texas at all, whereas, Giacomini regularly ships to the Port of Houston. We hold that Giacomini has minimum contacts with the State of Texas sufficient to authorize an exercise of specific jurisdiction over it in the context of this lawsuit.

### B. Fair Play & Substantial Justice

▇▇▇ Even when minimum contacts are established, a Texas court may not exercise jurisdiction over a nonresident defendant unless the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Accord CMMC*, 929 S.W.2d at 437. The Texas Supreme Court has stated that "[i]n this inquiry, it is incumbent upon the defendant to present 'a compelling case that the presence of some consideration would render jurisdiction unreasonable.'" *Guardian Royal Exch. Assur., Ltd.*, 815 S.W.2d at

231 (quoting *Burger King*, 471 U.S. at 477, 105 S.Ct. 2174). The following factors, when appropriate, should be considered: (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute (including the state's special regulatory interest in areas such as insurance); (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Id.* "Only in rare cases, however, will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *Id.* (citing *Burger King*, 471 U.S. at 477–78, 105 S.Ct. 2174). Rather, "[m]ost such considerations usually may be accommodated through means short of finding jurisdiction unconstitutional," for example, through application of the forum's choice-of-law or change of venue rules. *Id.* (citing *Burger King*, 471 U.S. at 477, 105 S.Ct. 2174). Also, "distance alone is not ordinarily sufficient to defeat jurisdiction: 'modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity.'" *Id.*

We hold that the Texas court's exercise of personal jurisdiction over Giacomini does not offend traditional notions of fair play and substantial justice. While international litigation does present a substantial burden on the defendant, the burden is not unreasonable considering the fact that a significant number of Giacomini's products are regularly shipped to and sold in this state. Moreover, the burden on the plaintiff would be at least as great as the burden on Giacomini, especially in light of the fact that the plaintiff's injuries have no

relation to any activity the plaintiff conducted in Italy. When a Texas citizen is injured by a defectively manufactured product that is marketed to the citizens of this state, the state has a considerable interest in its citizen's ability to seek redress for his damages.

This case is similar to a case recently decided by the Texarkana court of appeals, *LeBlanc v. Kyle,* 28 S.W.3d 99, 105–106 (Tex.App.—Texarkana 2000, pet. filed Oct. 27, 2000). That court held that maintaining an action against a French manufacturer for an allegedly defective water heater that was sold in Texas did not offend traditional notions of fair play and substantial justice. *Id.* The court stated,

> Kyle purchased and installed the water heater in Texas, which means that he has a strong interest in litigating the case here. Considering that LeBlanc sent over 450 of its water heaters into Texas pursuant to its contract with Controlled Energy, LeBlanc could reasonably anticipate being brought into court here. *World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. 559, 62 L.Ed.2d 490. Just because this is an "international dispute" does not mean that maintaining jurisdiction in Texas is unfair. In *Asahi,* a majority of the Court found that California did not have a sufficient interest in litigation between a Japanese company and a Taiwanese company. *Asahi,* 480 U.S. at 116, 107 S.Ct. 1026. In contrast, Texas has an interest in litigation between one of its citizens and a manufacturer and supplier of products to its market.

---

1. In its first issue, Giacomini complains of the trial court's failure to file findings of facts and conclusions of law and suggests that this Court should abate this appeal and instruct the trial court to file them. Because the facts are undisputed, we do not address this point.

*LeBlanc,* 28 S.W.3d at 105–106. Similarly, we do not find that the district court's exercise of jurisdiction over Giacomini offends traditional notions of fair play and substantial justice. We affirm the order of the trial court denying Giacomini's special appearance.[1]

Additionally, the parties raised at oral argument an issue regarding supplementation of the record. Because that issue, also, would not impact the outcome of this appeal, we do not address it either. *See* TEX.R.APP.P. 47.1.