SEMPERIT TECHNISCHE PRO-
DUKTE GESELLSCHAFT
M.B.H., Appellant,

v.

Desiree Y. HENNESSY, as Next Friend
of Allison D. Smithers, a Minor and
Holly S. Vidrine, as Next Friend of
Sadie R. Smithers, a Minor, Kimber
Rose Hunter, as Next Friend of Cedric
Sean Smithers, a Minor, and Cindy
Walling, Appellees.

No. 08–14–00172–CV

Court of Appeals of Texas,
El Paso.

April 6, 2016

Bowen Berry, C. H. Hal Brockett, Jr., Clinton J. Echols, Christopher Wayne Weber, Brian Scott Bradley, Carl H. Green, William Everett Berry Jr., Jose Luis Garriga, for Appellees.

Sherman Vance Wittie, for Appellant.

Before McClure, C.J., Rodriguez, and Hughes, JJ.

## OPINION

ANN CRAWFORD McCLURE, Chief Justice

In *Spir Star AG v. Kimich*[1] the Texas Supreme Court upheld the exercise of jurisdiction over a German hose manufacturer which had sold one of its hoses to a wholly owned Texas subsidiary, who in turn sold it to a Texas end user, where it was alleged to have failed and caused injury. In this case, we are presented with a similar fact pattern, but for the hose first being sold to a wholly owned New Jersey subsidiary, who then sold it to an Oklahoma distributor, who then resold it into the State of Texas. On the facts of this case, we find these distinctions immaterial and affirm the trial court's decision below which denied the manufacturer's special appearance.

## FACTUAL SUMMARY

This case arises out of an accident at a drilling site that took the life of Cedric Scott Smithers on September 10, 2010. Smithers was survived by three minor children, Allison, Sadie, and Cedric Sean, all of whom have appeared through different next friends in the lawsuit below. Cedric Scott was also survived by his mother, Cindy Walling, who has sued individually and behalf of his estate (all collectively referred to as the Smithers).

The accident occurred while workers were using a high pressure hydraulic hose that was attached to a high pressure line. The Smithers allege that the hose failed, causing a pressure release that threw Cedric Scott Smithers into the oil derrick leading to his fatal injuries. The Smithers have sued Cedric Scott's employer, other contractors at the rig, and germane to this appeal, they added Semperit Aktiengesellschaft Holding, (Semperit Holding), Semperit Technische Produkte Gesellschaft M.B.H. (STP), and Semperit Industrial Products, Inc. (SIP). STP filed a special appearance which was denied by the trial court and it is the only Semperit party actually before us, but a brief overview of all three Semperit entities is necessary to understand the issues raised.

Semperit Holding is just that, a holding company that owns all shares of STP. Its website describes itself as a company which: "develops, produces, and sells highly specialised rubber and plastic products for the medical and industrial sectors: examination and surgical gloves, hydraulic and industrial hoses, conveyor belts, esca-

---

1. 310 S.W.3d 868 (Tex.2010).

lator handrails, construction profiles, cable car rings, and products for railway superstructures." Semperit Holdings has never answered the suit and it is not a party to this appeal.

One of the companies that it owns, STP, is an Austrian company with home offices in Vienna, Austria. STP manufactures a variety of rubber products including hydraulic and industrial hoses, gloves, and handrails for escalators. It apparently manufactured the hose which was involved in this accident and a date stamp on the remnants of the hose suggests it was made in the early part of 2005. All of STP's manufacturing facilities are outside the United States. The jurisdictional dispute here turns on how the hose found its way to a drilling rig in Upton County, Texas, some five years later.

STP owns 100 percent of the stock of SIP, a New Jersey corporation formed in 1985 with its only office located in New Jersey. SIP was created to sell STP products in the United States. It also sells some products from other Semperit joint ventures, and sold its own line of escalator handrails. But by far the majority of its sales are of STP hydraulic and industrial hoses.

When SIP sells a product to an American customer, it notifies STP who then ships the product directly to the American customer. STP invoices SIP for the item sold. SIP adds a 10 percent mark-up and invoices its customer. The terms for payment will usually result in SIP being paid by its customer before it must remit payment to STP. STP's standard terms and conditions provide that it retains title to the goods until its invoice is paid in full. Based on shipping instructions, STP is aware that its products, including hydraulic hoses, are being sold in Texas.

From 2002 to 2012, STP delivered some $7,179,824 of STP products in Texas.[2] This sum is less than 1 percent of its worldwide sales and about 3 percent of its United States sales over that same period of time. Of that total, almost two million dollars came from the direct sale of goods from STP to an existing European customer who through merger wound up with a Texas facility that purchased blowout preventer hoses.

The hose at issue in this lawsuit was sold to SIP who in turn sold it to Mid West Hose & Specialty, Inc. (Mid West). Mid West primarily sells hoses to the oil and gas industry, and it serves ten states through twenty-three offices. It is an Oklahoma company whose main facility is in Oklahoma City. At the time of the sale of this particular hose, it had four offices in Texas. In 2005, about half its sales were to Texas. SIP's president visited Mid West twice per year and once went to its facility in Houston to see what opportunities SIP might have there.

Mid West buys branded hoses from SIP, meaning that before the rubber hose is vulcanized in STP's Austria facility, STP applies Mid West's markings to the hose. Mid West could then resell the hose under its own brand label. The hoses are also stamped with "MSHA" denoting that they comply with federal Mine Safety and Health Administration guidelines for the United States marketplace. Mid West

---

**2.** This figure comes from a declaration of Michael Adelbauer filed with STP's Special Appearance and Answer. He was deposed and in the course of that deposition, discussed an amended declaration which corrected the total sales number to $4.9 million. The correction removed certain sales from other related Semperit entities. STP's Amended Special Appearance and Answer also references this corrected figure. We cannot find the corrected declaration in the record on appeal, but whether the total sales were $7,179,824 or $4.9 million does not alter our view of the case.

buys this particular type of hose in 40 meter segments that it then cuts to size based on customer specifications. Almost all of the hoses sold to Mid West by SIP were delivered to Mid West's main facility in Oklahoma. Mid West's president believed that 95 percent of the product was delivered there, but the record contains some invoices reflecting STP deliveries to Mid West offices in Houston, Dallas, and Fort Worth.

Based on this course of business, Mid West's president believed that the accident hose was most likely delivered to Mid West in Oklahoma and then shipped by Mid West to its sales office in Odessa, Texas. That location then sold it to O–Tex Pumping, another defendant below. The record is silent as how the hose got from O–Tex Pumping to the drill rig site where the injury occurred.

There is no written agreement between SIP and STP, but rather an "understanding" which dictates the terms of their relationship. Principally SIP sells STP products in the United States. This would include every state, including Texas. SIP sells Semperit products and could not, for instance, decide to carry another hose manufacturer's line. SIP's President directly reports to an employee of STP.[3] STP reviews and approves SIP's budget, including salaries and other company costs. STP would approve new hires. Without any written agreement, SIP uses STP's Semperit logo on its correspondence. In 2005, SIP had excess funds from the sale of property which was loaned to another Semperit related entity based on instructions from STP.

STP owns no property in Texas. It does not advertise its products in the United States generally, or Texas specifically.

It does send a product catalog to SIP who uses the catalog with its customers. As for its own employees, two officers from STP's medical supply division once attended an annual sales meeting in San Antonio. One STP manager also went to Dallas in 2006 to investigate the market for escalator handrails.

SIP targets customers that can use their products rather than specific geographical regions. It primarily sells to agricultural based companies, but is aware some of its hoses are used in the oil and gas business. It sells hydraulic hoses to at least six Texas customers. Over a several year period, SIP's president had visited its customers in Texas, as well as contacted twenty-five to fifty Texas prospective customers. SIP is also aware that its sales to Mid West in Oklahoma will result in hoses making their way into Texas. SIP appeared in the lawsuit and has not challenged the trial court's jurisdiction.

## PROCEDURAL SUMMARY

The Smithers sued the entities in the chain of distribution of the hose, including O–Tex Pumping, Mid West, SIP, and STP. They alleged that STP is in the business of designing, manufacturing, marketing, and distributing high pressure hoses. Based on this premise, they sued STP under negligence, products liability, and breach of warranty theories. Only STP filed a special appearance contesting personal jurisdiction. In response to the special appearance, the Smithers contended in part that the court has jurisdiction over STP under the "stream of commerce" doctrine. Some of the Smithers also alleged that SIP is the alter ego of STP and that any actions of SIP can be attributed to STP for jurisdictional purposes.[4] Finally, the

---

**3.** SIP sends some written reports to Semperit Holdings.

**4.** Allison and Sadie Smithers, through their respective next friends, were the original

Smithers noted that SIP's New Jersey corporate charter was forfeited from March 16, 2007 to February 6, 2013. Because SIP entered a general appearance in this lawsuit during that period of time, the Smithers reasoned that it must have been filed by STP as the owner/partner of a defunct corporation, and thus constitutes a general appearance by STP. Overarching all of these arguments, the Smithers contended that the technical data and information needed for their products liability claim resides with STP in Austria, and it would be unfair to require them to attempt to get such information from a non-party in a foreign jurisdiction. The trial court denied the special appearance and this interlocutory appeal follows.

## STANDARD OF REVIEW

■ When a trial court does not issue findings of fact and conclusions of law with its special appearance ruling, as in this case, we imply all facts necessary to support the ruling which are supported by the evidence. *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 795 (Tex.2002); *In re E.S.,* 304 S.W.3d 571, 574 (Tex. App.—El Paso 2010, pet. denied). So long as we have a complete record, these implied findings may be challenged for legal and factual sufficiency. *Roberson v. Robinson,* 768 S.W.2d 280, 281 (Tex.1989); *Zac Smith & Co., Inc. v. Otis Elevator Co.,* 734 S.W.2d 662, 666 (Tex.1987).

■ When reviewing the legal sufficiency of the implied findings, "we consider only the evidence and inferences tending to support the trial court's finding, disregarding all contrary evidence and inferences." *Sotelo v. Gonzales,* 170 S.W.3d

783, 787 (Tex.App.—El Paso 2005, no pet.), *citing Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex.2001). The trial court's ruling must be upheld if any probative evidence supports the factual finding. *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992); *Hodson v. Keiser,* 81 S.W.3d 363, 367 (Tex.App.—El Paso 2002, no pet.). When reviewing the factual sufficiency of the evidence, we consider all the evidence including that which tends to prove the existence of a vital fact, as well as evidence which tends to disprove its existence. *Sotelo,* 170 S.W.3d at 787; *Lide v. Lide,* 116 S.W.3d 147, 151 (Tex.App.—El Paso 2003, no pet.). We will not reverse on factual sufficiency unless the trial court's finding was so against the great weight and preponderance of the evidence that it was manifestly wrong. *Sotelo,* 170 S.W.3d at 787; *Lide,* 116 S.W.3d at 151.

## PERSONAL JURISDICTION

■ A Texas court may exercise jurisdiction over a nonresident defendant doing business in Texas as set out in the long arm statute. TEX.CIV.PRAC. & REM.CODE ANN. §§ 17.041–.045 (West 2015). The long arm statute extends a Texas court's personal jurisdiction "as far as the federal constitutional requirements of due process will permit." *U–Anchor Adver., Inc. v. Burt,* 553 S.W.2d 760, 762 (Tex.1977). Accordingly, the contours of federal due process guide our decision.

■ Federal due process limits a court's jurisdiction over nonresident defendants unless: (1) the defendant has established minimum contacts with the forum state, and (2) the exercise of jurisdiction comports with traditional notions of fair

plaintiffs in the lawsuit and raised a specific alter ego allegation as to STP and SIP in their Fifth Amended Original Petition. Kimber Rose Hunter as next friend of Cedric Sean Smithers, and Cindy Walling, individually and

as administrator of the estate of Cedric Scott Smithers intervened into the lawsuit and have not expressly raised an alter ego pleading specific to STP and SIP.

play and substantial justice. *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). "As a general rule, the exercise of judicial power is not lawful unless the defendant 'purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873, 131 S.Ct. 2780, 2785, 180 L.Ed.2d 765 (2011), *quoting Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex.2007); *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex.2005)("For half a century, the touchstone of jurisdictional due process has been 'purposeful availment.'"). Purposeful availment includes deliberately engaging in significant activities within a state or creating continuing obligations with residents of the forum. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76, 105 S.Ct. 2174, 2183–84, 85 L.Ed.2d 528, 542–43 (1985). It includes seeking profit, benefits, or advantage from the forum. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex.2005). It excludes, however, "random," "fortuitous" or "attenuated" contacts or the "unilateral activity of another party or a third person." *Burger King*, 471 U.S. at 475–76, 105 S.Ct. 2174; *Michiana*, 168 S.W.3d at 790 ("[M]inimum-contacts analysis, focuses solely on the actions and reasonable expectations of the defendant.").

■■ Personal jurisdiction can be either "general" or "specific." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *CSR Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex.1996). General (or all purpose) jurisdiction describes a defendant with contacts so continuous and systematic "as to render [it] essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 131 S.Ct. 2846, 2851, 180 L.Ed.2d 796 (2011). In such a case, the cause of action need not arise from the defendant's forum contacts. *CSR*, 925 S.W.2d at 595.

■ The Smithers did not argue for general jurisdiction below, or before this court. Rather, they contend that STP is subject to specific jurisdiction, which requires the claim to arise out of or be related to the defendant's contacts with the forum. *Helicopteros*, 466 U.S. at 414 n. 8, 104 S.Ct. 1868; *CSR*, 925 S.W.2d at 595. Specific jurisdiction is not as exacting as general jurisdiction in the sense that the contacts may be more sporadic or isolated so long as the cause of action arises out of those contacts. *Spir Star AG v. Kimich*, 310 S.W.3d 868, 873 (Tex.2010), *quoting* 4 Charles Alan Wright & Arthur Miller, Federal Practice & Procedure 1067.5 (3d ed.2002).

■ Products liability cases are often analyzed under the "stream of commerce" metaphor from *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297–98, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Thus, "[t]he forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State" and those products subsequently injure forum consumers. *Id.* Nonetheless, a plurality of the U.S. Supreme Court has held that the mere introduction of a product into the stream of commerce is not sufficient by itself to subject the manufacturer to suit wherever the product may end up. *Asahi Metal Ind. Co. v. Superior Court*, 480 U.S. 102, 112, 107 S.Ct. 1026, 1032, 94 L.Ed.2d 92 (1987). Instead, under Justice O'Conner's plurality

opinion, a court must find stream of commerce "plus." *Id.* Examples of the "plus" might include "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Id.*

But four justices in *Asahi Metal* disagreed that proof of the plus factors are necessary. *Id.* at 116, 107 S.Ct. 1026, 1032 (Brennan, J., concurring in part). Rather, foreseeability that the product will enter the forum while still in the stream of commerce is sufficient. *Id.* These justices would use the second part of the *International Shoe* test—comporting with traditional notions of fair play and substantial justice—to a protect a product seller from the anomalous eddies that sometimes arise in the stream of commerce. *Id.* The Fifth Circuit has followed Justice Brennan's rationale. *Ainsworth v. Moffett Engineering, Ltd.,* 716 F.3d 174, 177 (5th Cir.2013); *Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.,* 9 F.3d 415, 419 (5th Cir.1993)("a defendant's placing of its product into the stream of commerce with the knowledge that the product will be used in the forum state is enough to constitute minimum contacts"). But our own Texas Supreme Court has more closely followed Justice O'Conner's stream of commerce "plus" approach. *Moki Mac,* 221 S.W.3d at 577, which we are bound to follow here.[5]

The court last visited stream of commerce in *J. McIntyre Machinery, Ltd. v. Nicastro,* 564 U.S. 873, 131 S.Ct. 2780, 2785, 180 L.Ed.2d 765 (2011). In *Nicastro,* an English manufacturing company retained an independent U.S. distributor

to sell its scrap metal machinery anywhere it could in the United States. At least one, but no more than four of the machines found their way to New Jersey, where a worker was injured while using the machine. *Id.* at 2786. The manufacturer neither marketed, nor shipped, any of the machines to New Jersey. *Id.* A lower court found that the manufacturer, which contracted with the independent distributor, could have reasonably anticipated its product would make it to New Jersey which justified personal jurisdiction over the company in a product liability suit. *Nicastro v. McIntyre Machinery America, Ltd.,* 201 N.J. 48, 76, 77, 987 A.2d 575, 591, 592 (2010). A plurality of the court disagreed and sought to provide "greater clarity" to *Asahi Metals.* 131 S.Ct. at 2786. It focused on the lack of any purposeful targeting of New Jersey, as distinct from general targeting the United States market, in finding a lack of jurisdiction. *Id.* at 2788–90. But this suggestion garnered no more than four votes. Justices Breyer and Alito concurred in the result, but believed existing precedent, particularly that which suggests a single isolated sale would not establish jurisdiction, resolved the issues before the court. *Id.* at 2792 (Breyer, concurring). The concurrence was not comfortable with the plurality approach of requiring proof that a putative defendant had submitted "to the power of a sovereign" or targeted the forum. *Id.* at 2793. But nor was the concurrence approving of the lower court's view that mere foreseeability of a product reaching a particular state sufficient. With respect to nationwide distribution networks, the concurrence suggests a more flexible approach. *Id.* at 2793 (Breyer, concurring)("What might appear fair in the case of a large

---

**5.** In their brief to this Court, the Smithers as a matter of error preservation ask that either the Texas Supreme Court or the United States Supreme Court adopt Justice Brennan's stream of commerce analysis.

manufacturer which specifically seeks, or expects, an equal-sized distributor to sell its product in a distant State might seem unfair in the case of a small manufacturer (say, an Appalachian potter) who sells his product (cups and saucers) exclusively to a large distributor, who resells a single item (a coffee mug) to a buyer from a distant State (Hawaii).").  *Nicastro* teaches that six justices on the court, for differing reasons, are not inclined to find the single fact of a nationwide distribution network would always be sufficient to establish personal jurisdiction in each of the fifty states.  The concurring justices, whose rationale controls, appear to favor a more flexible approach.[6]

A second requirement for any specific jurisdiction forum contact is that it must arise out of or relate to the litigation.  *Moki Mac*, 221 S.W.3d at 579.  Different jurisdictions construe this nexus requirement in varying ways, some broadly and some narrowly.  *Id.* at 580–84.  In *Moki Mac*, the Texas Supreme Court opted for a middle ground approach such that there must be a "substantial connection" between the nonresident's contacts and the operative facts of the litigation.  *Id.* at 585.  The operative facts of the litigation are those that would be the focus of the trial.  *Id.*

In *Moki Mac*, for instance, a Utah outfitter advertised for customers in Texas to take river rafting trips.  *Id.* at 573.  The advertising included brochures and emails sent to those Texans on its distribution list, ads in publications with a Texas following, and free trip incentives to those who recruited others.  *Id.* at 577–78.  A Texas resident who claimed to rely on various representations in the advertisements sent their son to take a trip.  *Id.* at 573.  While walking on a trail in the Grand Canyon with the tour guides, the son fell to his death.  *Id.* While the outfitters' targeting of Texans met the first part of the minimum contacts test, none of the contacts were substantially related to the issues in the lawsuit.  *Id.* at 585.  The trial would principally focus on the guides' conduct in leading the hike which led to the child's death and the "overwhelming majority of the evidence will be directed to that question." *Id.* Only after that issue is decided, would the jury need to consider how the representations in the Texas advertisements factor into the case.  Relying on a series of similar cases holding that in-state advertisements were insufficiently connected to out-of-state injuries, the court concluded that none of the contacts arose out of, or were related to, the operative facts of the case.  *Id.* at 586–88.

## IS THE EVIDENCE SUFFICIENT TO SUPPORT SPECIFIC JURISDICTION?

Stating the maxims for personal jurisdiction is often easier than applying them.  Or as our Supreme Court has stated several times, "the real difficulty lies not so much in the statement of the rules as it does in the application of the correct rule." *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex.1994), *quoting Southwest Battery Corp. v. Owen*, 115 S.W.2d 1097, 1099 (Tex. 1938).  Here, both parties advance arguments placing them in the wake of recent Texas Supreme Court decisions which

---

**6.** When the reasoning of a Supreme Court opinion does not command a majority vote, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Gregg v. Georgia*, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)(opinion of Stewart, Powell, and Stevens, JJ); *see also Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977).

plausibly support their positions. The Smithers focus on STP's contacts with Texas in light of the *Spir Star* case.

### STP's Purposeful Contacts With Texas

*Spir Star* also involved the blow out of a high pressure hose made by a German manufacturer, which found its way to Texas. 310 S.W.3d at 871. As here, the manufacturer established a subsidiary company to distribute the hose. *Id.* The wholly owned subsidiary was a Texas company and it admittedly was attempting to sell to the Texas gulf coast market with its several refineries. *Id.* at 877. Here, by contrast, STP uses SIP, a New Jersey company, to sell its products. It markets to the United States, which includes Texas. SIP does not claim to focus on any one state, but rather on companies that might have use for STP's products. But it also sells branded hoses to a sub-tier distributor, Mid West, that resells them to others.

The *Spir Star* court looked to the German manufacturer's own purposeful acts to establish jurisdiction. They included sending an officer to Houston to open the subsidiary and then staying there half the year to advance the business; establishing a distributor in the forum state; targeting a specific market in the forum state, and substantially profiting from the distribution system. *Id.* at 875–78. Not all of those facts are supported by this record. STP sent three representatives to Texas, but they sell unrelated product lines. The most analogous facts to *Spir Star* are that STP profited from its Texas sales. It sold almost two million dollars of hoses directly to one of its own Texas customers, and indirectly sold several more millions dollars of hoses to Texas customers through SIP. It also profited from the sale of hoses to Mid West, which in turn resold products in Texas, at least some of which STP could have known were directly delivered to Mid West's Texas locations. STP established SIP as its sales subsidiary in New Jersey. SIP targeted Texas both through its president visiting customers and potential customers. It also developed sales to Mid West, a sub-tier distributor, which SIP knew resold product into Texas through its several locations here. It thus participated in a distribution network that in multiple ways delivered STP's product to Texas end users.[7]

STP argues that these contacts don't fit the stream of commerce "plus" examples offered by Justice O'Conner in *Asahi Metals*. 480 U.S. at 112, 107 S.Ct. 1026. STP did not design a product for Texas, it did not advertise here, and there is no evidence of regular channels of communication with customers here. STP also contends that it does not use "a distributor who has agreed to serve as the sales agent in the forum State." 480 U.S. at 112, 107 S.Ct. 1026. While we may agree that the facts of this case do not squarely fit into the examples offered by *Asahi Metals*, we don't perceive those four examples to be exclusive of the kind of factors that guide this question. As early as the court's decision in *International Shoe Co. v. Washington*, it rejected the notion that personal jurisdiction might turn on "mechanical" tests. 326 U.S. at 319, 66 S.Ct. 154. The "plus" factor in this case is a distribution network that in fact has resulted in STP selling millions of dollars of goods to Texas customers. The volume of sales elevates this case beyond the "random," "fortui-

---

**7.** STP's delivery terms also provide that it retains title to the product until its bill is paid in full, and the sequencing of payments would likely mean the product was still not fully paid for while in the possession of a Texas customer. Though it never had to invoke such protections, it would have needed to seek Texas' assistance to regain possession of the hoses if its bill ever went unpaid.

tous" or "attenuated" contacts alluded to *Burger King Corp. v. Rudzewicz*, 471 U.S. at 475–76, 105 S.Ct. 2174. The branding of the hose for a sub-tier distributor which targets Texas demonstrates purposeful availment of the Texas marketplace, as does delivery of substantial product here.

STP places great reliance on its distributor, SIP, directing its efforts to the United States as whole, and not Texas in particular. And indeed, the plurality opinion in *Nicastro* supports that view. But *Nicastro* is controlled by the concurring opinion which suggests a more flexible approach. The concurrence was concerned with a nationwide distribution network creating expansive jurisdiction over small businesses (the example of the Appalachian potter). *Id.* at 2793. Even the plurality shared that concern, citing the example of the small Florida farmer whose crop is sold to a distributor who in turn sells it nationwide. *Id.* at 2790. These situations are far different from a worldwide based manufacturer who creates a United States subsidiary to sell product wherever the product can be sold, and which in fact succeeds to a significant extent in Texas.[8]

Several cases support this view. The Sixth Circuit Court of Appeals found that a Dutch pharmaceutical company selling its drug through a United States distributor could be sued in Kentucky where the drug was sold and used. *Tobin v. Astra Pharm. Prods., Inc.*, 993 F.2d 528, 545 (6th Cir.1993). The agreement between the Dutch manufacturer and the American distributor required the distributor to market the drug in a defined territory, which included all fifty states. *Id.* at 543. The court considered this distribution agreement as the plus factor required in *Asahi* because it was a deliberate decision to market in all fifty states, including Kentucky. *Id.* The court rejected the contention that the marketing effort was to the United States as a whole, and not Kentucky in particular, noting that if it accepted that view, "a foreign manufacturer could insulate itself from liability in each of the fifty states simply by using an independent national distributor to market its products...." *Id.* at 544. *Tobin* is also noteworthy in that the Texas Supreme Court cited it in *Spir Star* for the proposition that "specific jurisdiction over foreign manufacturers is often premised on sales by independent distributors." 310 S.W.3d at 875.

Similarly, the Texarkana Court of Appeals in *E.L.M. LeBlanc v. Kyle*, 28 S.W.3d 99 (Tex.App.—Texarkana 2000, pet. denied) upheld personal jurisdiction over a French hot water heater manufacturer who sold its products to a Vermont distributor who in turn sold an allegedly defective heater to a Texas company. *Id.* at 100. The distribution agreement intended that the Vermont company sell product in its territory, which included all fifty states. *Id.* Through this arrangement, some 452 units were sold in Texas over a five year period. *Id.* The court rejected the notion that by intending to serve all fifty states, the manufacturer was not targeting any specific state for jurisdictional purposes. *Id.* at 104. Rather, an agreement to serve the fifty states "demonstrates a purposeful effort to serve the United States market, which includes Tex-

---

**8.** There are also distinguishing facts from *Nicastro*. The court noted there that the distributor was "independent" and that there were no allegations it was controlled by the manufacturer. 131 S.Ct. at 2786. The court also notes that the English manufacturer did not deliver any of its products to New Jersey. *Id.* Here, STP owned SIP and at least had that level of control which any parent would have over a subsidiary. STP also participated in the delivery of several million dollars of goods to Texas.

as. *Id.*; *see also S.P.A. Giacomini v. Lamping*, 42 S.W.3d 265 (Tex.App.—Corpus Christi 2001, no pet.)(Italian valve maker established minimum contacts by delivering "mass quantities of its products to a distributor in Texas, fully aware that the distributor will be marketing significant quantities to customers in Texas.").

STP attempts to distinguish *Tobin* by arguing that the contract *required* the distributor to target all fifty states.[9] A later case by the same court held the mere acquiescence to a distributor selling in a particular state was insufficient to establish jurisdiction. *Bridgeport Music, Inc. v. Still N the Water Pub.*, 327 F.3d 472, 476, 483 (6th Cir.2003)(finding no jurisdiction over defendant who put no duty on distributor to sell in all fifty states, but finding jurisdiction over another defendant who did). Because STP and SIP had no written contract, but only an "understanding", we agree the nature of their intentions are not as clear as in *Tobin* or *Kyle*. But in the procedural context of this case where STP must challenge the implied findings of the trial court, the lack of written agreement is a burden and not a boon. The trial court had testimony from an STP's corporate representative describing the understanding in this way:

Q. And getting back to the whole purpose of creating SIP, it is to sell Semperit products in the United States; is that correct?

A. That's right, that's correct.

Q. And when you talk about—now the United States is a big place.

A. Uh-huh.

Q. There's—is there any kind of geographical limitation with respect to the U.S. and the sales of Semperit products that this SIP is conducting?

A. No, there's no limitation.

Q. Okay. So it could be anywhere from the east coast of the United States all the way to the west coast, and that would include Texas, of course, right?

A. That's right, correct.

And as in *Kyle*, the trial court had before it the fact that substantial sales had in fact been made in Texas. *Id.* at 104 ("The shipment of 452 LeBlanc water heaters into Texas ... is also indicative of LeBlanc's effort to serve the Texas market."). It also had evidence that STP assisted in those sales to Texas by itself making the delivery of the products here. The trial court could have also concluded from this record that STP was delivering product to a sub-tier distributor (Mid West) which was actively targeting Texas.

This case fits between the bookends of *CMMC v. Salinas*, 929 S.W.2d 435 (1996) and *Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199 (Tex.1985). In *Salinas*, the court held that the sale of a winepress from a French manufacturer, through an out-of-state distributor to a Texas resident, could not support personal jurisdiction. Even though the French manufacturer had sold one other machine in Texas, and knew the wine press was destined for Texas, there was no indication the product "regularly find[s] its way to Texas." 929 S.W.2d at 439. Conversely, in *Middleton*, the court upheld personal jurisdiction over a Japanese company that sold 40 to 48 million dollars of product to Texas each year through a distributor. 699 S.W.2d at 201. STP's sale of several millions dollars of goods to Texas falls somewhere in between, but it seems more than the isolated or sporadic type sales as in *Salinas*.

Nor do we find *CSR Ltd. v. Link* dispositive. There, an Australian defendant delivered title to a single shipment of 353 tons of raw asbestos to Johns–Manville in

---

**9.** STP does not respond to the *E.L.M. LeBlanc v. Kyle* case at all.

Australia and was sued in Texas years later on product liability claims. 925 S.W.2d at 594. The plaintiffs alleged that the Australian company knew Johns Manville was shipping the product to the port of Houston, and that it had one factory in Texas. *Id.* at 595. Because foreseeability alone cannot support jurisdiction, the court held the Texas courts lacked jurisdiction. *Id.* But STP's contacts go beyond mere foreseeability. It actually shipped hoses to Texas. It put Mid West's brand on the hoses which aides Mid West's business model of reselling the hoses into other states, including Texas. As the *CSR* court noted, foreseeability alone is not sufficient, but it is a factor, and here taken in conjunction with STP other actions, it reflects a purposeful availment. We find no error in the trial court's implied findings that STP engaged in purposeful activity directed towards Texas in the sale of its hose products.

### The Connection Between Those Contacts and the Torts Alleged

■ STP focuses on the lack of connection between the sales of STP products in Texas and the allegations made here. Because the actual hose which failed was sold in Oklahoma, STP argues the other Texas sales lose their jurisdictional luster. The Oklahoma sale only resulted in the hose making it to Texas because of the acts of a third party—Mid West—and STP correctly notes that it's the *defendant's* contacts with the forum, not those of third parties, that dictate the parameters of personal jurisdiction under the Due Process Clause. *Michiana,* 168 S.W.3d at 785.

STP relies on *Moki Mac* which discounted a series of forum contacts with Texas because they were only tangential to the operative facts of the litigation. 221 S.W.3d at 585. The jurisdictional contacts related to advertisements and other ways the tour operator reached out to Texans to entice them to take the trip. *Id.* The trial of the case, however, would turn on the conduct of the tour guides leading a group of hikers along a ledge in the Grand Canyon. *Id.* STP argues here that nothing about its direct sales to another company, or its deliveries to other Texas companies on behalf of SIP, or even its knowledge of Mid West's possible deliveries in Texas, are operative facts in the Smithers' claim.

A few cases have applied *Moki Mac* in the product's liability context. The Fourteenth Court of Appeals applied the substantial connection rule in a pair of cases involving the sale and use of respiratory hoods in silica exposure cases. *See Moore v. Pulmosan Safety Equip. Corp.,* 278 S.W.3d 27 (Tex.App.—Houston [14th Dist.] 2008, pet. denied) and *Pulmosan Safety Equip. Corp. v. Lamb,* 273 S.W.3d 829 (Tex.App.—Houston [14th Dist.] 2008, pet. denied). In *Moore,* a New York manufacturer sold the respiratory hood to a Texas entity which in turn sold it to a Louisiana firm. The worker used the hood in Louisiana and was injured there. While the hood maker had several contacts with Texas, none of these contacts, including the passage of the hood through Texas, were substantially related to the operative facts of the underlying case. Instead, the operative facts would focus on the place of manufacturer (New York) and the place of injury (Louisiana). *Id.* at 38.

Conversely in *Lamb,* the hood was used in Texas and the injury occurred here. 273 S.W.3d at 833. There was no direct evidence the hood was sold in Texas, although it could have been. *Id.* at 834. The manufacturer contended in part that there was no substantial connection because the only relevant issues would be the condition of the hood when it left its state of manufacturing—New York. *Id.* at 839.

The court disagreed, and envisioned that there would be several relevant issues arising out of Texas based facts, such as the warnings that accompanied the product at time of sale, and the condition of the worksite in Texas. *Id.* at 841. Each of these cases considers as operative facts circumstances from the place of injury, even though the out-of-state defendant was not present at the time of injury, and seemingly had little to do with use of the product here. Conversely, other court of appeals decisions have arguably taken a more restrictive view of how the defendant's specific contacts must relate to the underlying tort. *Denso Corp. v. Hall*, 396 S.W.3d 681, 692 (Tex.App.—Houston [14th Dist.] 2013, no pet.) (finding parent company's 151 visits to Texas not substantially related to accident that occurred here); *Control Solutions, Inc. v. Gharda Chemicals Ltd.*, 245 S.W.3d 550, 561 (Tex.App.—Houston [1st Dist.] 2007, no pet.)(focusing on delivery of product and instructions on use of product in Texas as operative facts to the litigation); *Flanagan v. Royal Body Care, Inc.*, 232 S.W.3d 369, 377 (Tex.App.—Dallas 2007, pet. denied)(focusing on the out-of-state defendant's exclusive licensing agreement and attendance at meeting in Texas, in a claim based on improper labeling and marketing).

The Texas Supreme Court also analyzed the nexus requirement in *Spir Star*. Its holding that the claim *arose* from the manufacturer's contacts is contained in a single paragraph that cites three cases with quoted material in parentheticals as support for the holding. 310 S.W.3d at 878, *citing World–Wide Volkswagen*; *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 374 (5th Cir. 1987) and *Hicks v. Kawasaki Heavy Indus.*, 452 F.Supp. 130, 134 (M.D.Pa.1978). *Spir Star* did not otherwise define what the operative facts of the litigation might be, or how they related to the German hose maker's Texas contacts. The quoted language from *World–Wide Volkswagen* and *Bearry* recite that it is not unreasonable to subject a manufacturer to a suit in a forum that arises from efforts to serve the forum directly or indirectly. The quoted language from *Hicks* states that there is a direct relationship between the contacts and the cause of action when the injury occurs in the forum state. Notably, *Hicks* involved a Japanese manufacturer which delivered title to the product in Japan to a related Delaware distributor, who in turn sold it to a store in Pennsylvania where the accident occurred. 452 F.Supp. at 131.

We note the challenge of *Moki Mac*'s application in a product liability setting. In a products case, the operative facts of the litigation ultimately focus on whether the product was unreasonably dangerous when it left the manufacturer's possession. *See Timpte Industries, Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex.2009); *Texas Pattern Jury Charges: Products* PJC 71.3 (defining manufacturing defect), 71.4 (defining design defect), 71.5 (defining warnings defect) (2014). In this case, for instance, we could envision the evidence focusing on how high pressure hoses are used in the drilling rig, what the workers knew and did not know about their use, and the risks and utility from the design of the hose. We can also anticipate abundant testimony about alternative designs, if any such exist. TEX.CIV.PRAC. & REM.CODE ANN. § 82.005(a)(West 2011). But almost none of these issues would implicate the kind of contacts that a manufacturer might typically have in the sale of its product in a forum. With the exception of a products case based on a warnings issue, where the manufacturer itself delivered warnings in the forum state, we are hard pressed to envision how the forum contacts would need to come into evidence at all.

Nor are we impressed with a rule that mechanically focuses only on whether the actual failed product was sold in Texas. If a manufacturer sold millions of dollars of goods in a Texas brick and mortar store, we cannot perceive that the manufacturer could properly challenge jurisdiction simply because a Texas customer happened to buy the same item on-line (as through Amazon or the like) and the actual sale is consummated from an out-of-state distributor. A bright line rule that requires the manufacturer to have sold the actual product which is the subject of the litigation in the forum state would require the on-line consumer to seek relief in whatever state the product might have been shipped from. For that reason, we reject a rule which looks only to the place where the actual product was sold, and instead adopt a more flexible approach consistent with what we believe the court in *Moki Mac* envisioned.

STP, however, contends that a single sentence in *Spir Star* commands the opposite result. After acknowledging that a manufacturer might be liable for products sold by a Texas distributor or affiliate, the court notes several limitations on those claims, including the substantial connection nexus requirement. *Id.* at 875. It then states: "[t]hat similar products were sold in Texas would not create a substantial connection to products that were not." *Id.* STP seizes upon this sentence as a bright line rule that precludes the Oklahoma sale of the hose as substantially connected to Texas litigation. We reject this argument if for no other reason than the sale to an Oklahoma sub-tier distributor, which itself targeted Texas, is functionally the same as a sale to a Texas distributor. There was sufficient evidence in the record that STP appreciated Mid West's business model, and affirmatively assisted it by through branding and delivery of the hose. Moreover, *Spir Star'*s citation to cases such as

*Tobin* and *Hicks* reflects it does not discount these indirect channels of commerce into Texas. In both of those cases, the manufacturer delivered their product to an out-of-state distributor who then in turn sold it into the forum.

■ Ultimately, an essential element of any products liability case is that the defendant is engaged in the business selling the product. *McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787, 788 (Tex.1967), citing RESTATEMENT (SECOND) OF TORTS § 402a (1977). Consistent with this predicate, the Smithers pleaded that STP was engaged in the business of selling high pressure hoses. And while not always challenged by the defendant, the Pattern Jury Charges include a specific question inquiring whether the defendant was engaged in the business of selling the product in question. Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Products* PJC 70.5 (2014)("Was *ABC Company* engaged in the business of selling table saws?") In that sense, at least, evidence of STP's sale of the product, including its other sales in Texas, is an operative fact of this litigation.

In summary, STP sold several millions of dollars' worth of industrial and high pressure hoses that it would have known were used in Texas. It in fact shipped much of the product here. A subsidiary that it created to market its goods actively and successfully penetrated the Texas market, both on its own and through a sub-tier distributor. A specific sale to that sub-tier distributor resulted in the hose finding its way to Upton County, where it is alleged to have failed. Accordingly, we find there is sufficient evidence to support the trial court's implied finding that STP's contacts are substantially connected to the operative facts of this case.

### The Fairness Prong of International Shoe

Requiring an out-of-state defendant to appear in the forum must also comport with traditional notions of fair play and substantial justice. *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 341 (Tex.2009). In evaluating this element, a court would consider: (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several States in furthering fundamental substantive social policies. *Guardian Royal Exchange Assur., Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 228, 231 (Tex.1991). "Only in rare cases, however, will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *Id.* at 231.

STP did not challenge this element below and does not contend on appeal that requiring it to defend this action in Texas offends traditional notions of fair play and substantial justice. The trial court's implied findings in this regard are thus unassailed.

### Is the Evidence Sufficient to Support an Alter Ego Finding?

Some of the Smithers also contended below that the jurisdictional contacts of SIP could be imputed to STP under the alter ego doctrine. To prevail on that argument, they needed to present some evidence that STP controls the internal business operations and affairs of the subsidiary "greater than that normally associated with common ownership and directorship." *BMC Software Belgium, N.V.*, 83 S.W.3d at 799 (citations omitted). The control must rise to the level such that the two entities cease to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice. *Id.* The inquiry in this regard is different from that used to determine the *liability* of one corporation for another. *PHC–Minden, L.P. v. Kimberly–Clark Corp.*, 235 S.W.3d 163, 174 (Tex.2007).

Prior decisions have outlined the quality of evidence needed to meet this burden. "A subsidiary corporation will not be regarded as the alter ego of its parent merely because of stock ownership, a duplication of some or all of the directors or officers, or an exercise of the control that stock ownership gives to stockholders." *Gentry v. Credit Plan Corp. of Houston*, 528 S.W.2d 571, 573 (Tex.1975). Sharing a common name, or lack of capitalization are not proper jurisdictional alter ego inquiries. *See PHC–Minden*, 235 S.W.3d at 174. Observance of corporate formalities strongly weighs against an alter ego finding. *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 335, 45 S.Ct. 250, 69 L.Ed. 634 (1925)(despite the parent's complete dominance, "[t]he existence of the [subsidiary] as a distinct corporate entity is, however, in all respects observed. Its books are kept separate. All transactions between the two corporations are represented by appropriate entries in their respective books in the same way as if the two were wholly independent corporations.").

Applying these principles, we reject out of hand most the evidence the Smithers offer under their alter ego claim. That STP required frequent detailed financial reporting and that the boards of each corporation had overlapping membership is of no consequence. *Gentry*, 528 S.W.2d at 573. That STP approved budgets does not show control beyond what a parent ordi-

narily exercises. *PHC–Minden,* 235 S.W.3d at 174, *citing* 16 Moore's Federal Practice § 108.42[3][b]. ("Appropriate parental involvement includes monitoring the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies."). The Smithers also place great weight on STP allowing SIP to let its corporate charter lapse, but that fact speaks more to a failing by SIP, than inordinate control by STP. Nor does the direction by STP to have SIP loan excess funds to another subsidiary support an alter ego finding. The loan was reflected in SIP's accounts and there is no evidence that such loans are not common between related entities.

The closest fact that the Smithers can advance is that STP had to approve hiring decisions by SIP. But in a sense, approving hiring is little different from approving budgets, which parent corporations are free to do. If STP can limit the amount budgeted for salespersons, it is of little moment that it can approve the hiring of an additional salesperson. Nor did the Smithers present any evidence that parent corporations do not routinely exercise this kind of control over the subsidiary companies that they own.

The Smithers rely on *Capital Technology Information Services, Inc. v. Arias & Arias Consultores,* 270 S.W.3d 741 (Tex. App.—Dallas 2008, pet. denied), a case which affirmed an alter ego finding. We note that case involved a number of factors absent here. The two entities shared the same office, and the employees were unsure of the distinction between the parent and subsidiary. *Id.* at 753. The owner viewed the entities as one and the same for functional purposes, a conclusion that was also similarly reflected in a board resolution. *Id.* at 754. While we acknowledge some similarities in the case, what the

Smithers lack here is evidence of how the control that STP exercised differs from that of an ordinary parent-subsidiary arrangement. To the extent the trial court made the finding that SIP is the alter ego of STP for jurisdictional purposes, we find no evidence in this record to support that particular basis for jurisdiction.

### *Does the Forfeiture of SIP's Corporate Charter Result in STP Having Entered a General Appearance?*

The Smithers discovered that SIP had let its New Jersey corporate charter lapse from March 16, 2007, to February 6, 2013. During that same time frame, SIP filed its answer to this suit. The Smithers contend that one who continues to transact business after the corporate charter has expired becomes personally liable as a general partner. From this, the Smithers reason that in effect STP had filed the SIP answer and made a general appearance, thus waiving the jurisdictional defense. They rely on *Patin v. Thoroughbred Power Boats, Inc.,* 294 F.3d 640 (5th Cir.2002) which involved a suit in Louisiana applying Florida law in the context of one corporation being held to have appeared based on the actions of a predecessor. In this context, Texas law would look to the law of New Jersey regarding the actions of a dissolved corporations. *Miller Mgmt. Co. v. State,* 140 Tex. 370, 373, 167 S.W.2d 728, 730 (Tex.1943). We find the answer to the Smithers argument in New Jersey law.

As apparently happened here, a New Jersey corporation may be dissolved "upon the proclamation of the Secretary of State...." N.J.S.A. 14A:12–1, 14A:12–8. Once dissolved, it may carry on business only for the purpose of winding up its affairs. N.J.S.A. 14A:12–9(1) ("Except as a court may otherwise direct, a dissolved corporation shall continue its corporate existence but shall carry on no business ex-

cept for the purpose of winding up its affairs...."). During that period, it is specifically authorized to defend a lawsuit. N.J.S.A. 14A:12–9(2)(e) ("the corporation may sue and be sued in its corporate name and process may issue by and against the corporation in the same manner as if dissolution had not occurred"); *Information Systems Services, Inc. v. Platt*, 598 Pa. 78, 83, 953 A.2d 1244, 1247 (2008)(applying New Jersey law); *see also Lancellotti v. Md. Cas. Co.*, 260 N.J.Super. 579, 583, 617 A.2d 296 (App.Div.1992)(explaining that "[a] dissolved corporation exists ... to prosecute and defend suits").

The Smithers contend that SIP did more than just wind up its affairs; it continued in business as if nothing had happened to its corporate charter. And while that may well be true, and there may be repercussions with the New Jersey authorities for such conduct, the answer that SIP filed in this lawsuit is entirely consistent with winding up its affairs. The hose that gives rise to this lawsuit was likely sold in the first quarter of 2005, a time period when SIP was legitimately transacting business. If that product failed, SIP would still have to respond to that alleged failure in any wind up phase of its business. The act of answering this suit—the only one that concerns us—was specifically authorized by New Jersey law. *See Needle v. Byram Cove, Inc.*, 2010 WL 2555710 at *4, *7 (N.J.Super.Ct.App.Div., June 24, 2010)(incorporated town whose corporate charter had been forfeited for thirty-one years, but which operated nonetheless, was still authorized to file suit in part under New Jersey wind up provisions).

SIP was able to prevail on the New Jersey authorities to reinstate the corporate charter. STP argues that once reinstated, the slate is wiped clean on any actions taken during the period of forfeiture. *Baker Hughes, Inc. v. Brooks*, 405 S.W.3d 246 (Tex.App.—Houston [14th

Dist.] 2013, pet. denied)(contract signed by corporate officer while charter forfeited, but later reinstated, did not confer jurisdiction on corporate officer); N.J.S.A.14A:4–5 ("The reinstatement relates back to the date of issuance of the proclamation revoking the certificate of incorporation or the certificate of authority and shall validate all actions taken in the interim."). The Smithers respond that under the Supremacy Clause, state law reinstatement principals cannot trump federal law governing jurisdiction. But the Smithers cite to no federal law governing the effect of reinstatement on a forfeited corporate charter, and certainly none which is at odds with the New Jersey scheme.

We find no basis to hold that STP made a general appearance through the answer filed by SIP during the period when its corporate charter was forfeited, and to the extent the trial court made any such implied finding, we find no evidence to support it.

## CONCLUSION

We overrule STP's Issue One (arguing that a hose sold to an Oklahoma company that found its way into Texas does not establish specific jurisdiction). We sustain Issue Two (that the jurisdictional contacts of SIP are not attributable to STP) to the extent that alter ego, or SIP's filing of a general denial are an independent ground for sustaining personal jurisdiction over STP. As noted above, we find that STP's creation of SIP for the purpose of marketing its products to Texas can be considered as a purposeful availment of the benefits and privileges of doing business in Texas, and to the extent Issue Two argues otherwise, we overrule that claim. For the reasons states, we affirm the decision of the trial court.