**Opinion issued December 17, 2020**



In The

# Court of Appeals

For The

# First District of Texas

—————————————

**NO. 01-20-00044-CV**

—————————————

**BRIGADE ELECTRONICS (UK) LTD. AND
BRIGADE ELECTRONICS INC., Appellants**

**V.**

**ANITA DEHANEY, INDIVIDUALLY AND AS THE EXECUTRIX OF
ESTATE OF ALTON FORD, SR., DECEASED, WILLIE JEFFERSON,
AND FALON IRBY, Appellees**

———

**On Appeal from the 190th District Court
Harris County, Texas
Trial Court Case No. 2017-80632**

———

**MEMORANDUM OPINION**

Appellees, Anita Dehaney, individually and as the Executrix of the Estate of

Alton Ford, Sr., deceased, Willie Jefferson, and Falon Irby, brought claims against

appellants, Brigade Electronics (UK) Ltd. ("Brigade (UK)") and Brigade Electronics, Inc. ("Brigade (US)"), for products liability and negligence, after their father was killed by a crane at a shipping port. In this interlocutory appeal,[1] appellants challenge the trial court's order denying their special appearances. In their sole issue, appellants contend that the trial court erred in denying their special appearances because appellees' jurisdictional allegations are insufficient to invoke personal jurisdiction and the jurisdictional evidence negates appellees' allegations.

We affirm.

## Background

Appellants are in the business of selling "back-up" alarms, i.e., reverse-motion alarms, including those used to warn workers of moving vehicles and heavy equipment in industrial settings. Appellants sell their patented broadband sound alarm ("BBS alarm" or "alarm(s)") worldwide. They assert that their BBS alarm, which emits a "shh-shh" or "burst of air" sound, is more audible and locatable than a traditional tonal alarm. Thus, a person in the proximity of moving equipment is more apt to decipher the source of the alarm and to avoid the danger. The sound is also more localized, which reduces ambient noise on a jobsite.

Brigade (UK) is a United Kingdom private limited company, with its principal place of business in the United Kingdom. It began selling BBS alarms in 2000.

---

[1] *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(7).

2

Brigade (US) is a New York corporation, with its principal place of business in Indiana (previously, Pennsylvania). Its formation was complete in late 2005, and it began selling BBS alarms thereafter.

During 2005, as discussed further below, the Port of Houston Authority (the "Port")[2] sought to replace the traditional tonal alarms on its equipment and vehicles to increase safety and to mitigate noise. The Port retained HFP Acoustical Consultants, Inc. ("HFP") to provide a technical evaluation of potential measures, and HFP identified the BBS alarm as one of the viable options. In May 2005, at the behest of the Port or HFP, a representative of Brigade (UK), Henry Morgan, visited the Port and demonstrated the BBS alarm on a rubber-tyred (or rubber-tired) gantry crane ("RTG crane").[3] The Port then obtained four BBS alarms from Brigade (UK) for testing and evaluation at the Port. The Port expressed concern about the availability of parts and inventory in the United States. In November 2005, Morgan traveled to Texas and attended a meeting at the Port. Subsequently, the Port elected to purchase BBS alarms for its facility.

---

[2]     The Port is a defendant in the trial court but not a party to this appeal.

[3]     A "gantry crane" is a crane built on a bridge-like structure, from which a load, such as a shipping container, is suspended from a traveling trolley. *See* Ass'n of Marine Underwriters of S.F., *Glossary of Marine Ins. and Shipping Terms*, 14 U.S.F. MAR. L.J. 305, 356 (2002).

Once Brigade (US) was formed in 2005, Morgan became its chief executive officer and general manager. In February 2006, Morgan sent an email to the Port, directing it to the Brigade (US) "regional distributor," "Medsafe/Gosafe" ("Medsafe") in Deer Park, Texas.[4] Medsafe sent a Price Quote to the Port for approximately 260 BBS alarms. Morgan again traveled to Texas to "reinforce the relationship" with the Port. In April 2006, the Port placed an order with Medsafe for $75,000.00 in alarms, and Brigade (US) shipped the alarms to the Port through Medsafe. The Port installed BBS alarms on its cranes operating at its Barbours Cut Terminal.

Eleven years later, on April 20, 2017, appellees' father, Alton Ford, Sr., while working as a truckdriver for Santana Trucking,[5] went to the Port, Barbours Cut Terminal, where a shipping container was to be loaded onto his truck for transport. Appellees alleged in their petition that, when Ford arrived, a Port employee directed him to alight from the truck and to locate the assigned container on foot. Appellees alleged that the instruction was in violation of the Port's policies and that Port employees did not warn crane operators in the vicinity to halt work while Ford searched for his container. As Ford walked among the container stacks, he did not

---

[4]    Medsafe is a defendant in the trial court but not a party to this appeal.

[5]    Santana Trucking is a defendant in the trial court but not a party to this appeal.

realize that one such operator, Terence Walker,[6] was operating an RTG crane in his path. When Ford emerged from between two stacks, the crane operated by Walker struck and pinned Ford and dragged him to his death.

It is undisputed that the RTG crane that struck the decedent was equipped with four BBS alarms. Appellees brought products liability and negligence claims against Brigade (UK) and Brigade (US),[7] collectively as "Brigade Electronics," alleging that the alarms failed to adequately warn the decedent, which caused or contributed to his death. They alleged that the alarms were not fit for the purpose of adequately warning those in proximity of the danger of a moving RTG crane, the alarms were defectively designed because they did not operate at a sufficient frequency and decibel level, and there was a foreseeable risk that the alarms would fail to warn the decedent of the danger of the oncoming crane. They asserted that the risk could have been reduced or avoided with a safer alternative design, which Brigade Electronics failed to adopt. Further, Brigade Electronics was negligent in marketing their BBS alarms for use at a marine port—a use for which the alarms are unsuitable because their sound is diminished or blocked by shipping containers.

---

[6]    Walker is a defendant in the trial court but not a party to this appeal.

[7]    Although appellees also named Brigade Electronics Group, PLC ("Brigade Group") as a defendant, the trial court granted its special appearance and dismissed the claims against it. Brigade Group, formed in 2009, did not exist at the time of the operative events. Appellees also brought claims against the Port; Medsafe; Santana Trucking; the crane manufacturer, Konecranes Finland Oy; and the crane inspector, Kempco. Again, these defendants are not parties to this appeal.

5

Appellees alleged that "specific jurisdiction is proper over Brigade Electronics because there are more than sufficient minimum contacts to support jurisdiction," and Brigade Electronics "purposefully availed themselves" of the privileges and protections of conducting business in Texas. They alleged that appellants "voluntarily and purposefully directed their actions toward the State of Texas" by delivering the alarms into the stream of commerce with the expectation that they would be purchased by Texas consumers. Further, the alarms were in fact purchased by the Port, in Texas, "where they caused injury."

Appellees further alleged that "Brigade Electronics" marketed the BBS alarms "for the particular purpose of use at marine ports such as the Port of Houston, when in fact the alarms are not suited for such purpose"; it "conducted extensive product testing" of the alarms at the Port in Texas; it manufactured and sold the alarms with knowledge that they would be used in Texas; and it delivered the alarms to the Port in Texas. In addition, Brigade Electronics "maintained a contract with Medsafe sufficient to establish a substantial connection to and minimum contacts" with Texas. Appellees noted that the Brigade Electronics website directly solicited contact information from Texas consumers in order to send information regarding products and services. And, Brigade Electronics maintained a "Case Studies > Port of Houston" page regarding its sale of BBS alarms to the Port for the purpose of advertising the alarms to Texas markets. Appellees asserted that the interests in

6

trying the case in Texas were substantial and that the burden on Brigade Electronics was not undue. Accordingly, the Texas trial court's exercise of personal jurisdiction over Brigade Electronics would not offend traditional notions of fair play and substantial justice.

Appellants each filed a special appearance, which are substantively identical, asserting that appellees did not meet their initial burden to plead sufficient allegations to bring appellants within the provisions of the Texas long-arm statute. And, appellees failed to allege that appellants "purposefully engaged in any activity in Texas that caused injury there" and failed to demonstrate that the Texas court has jurisdiction over them. They asserted that the United States Supreme Court has "rejected the notion that simply placing a product into the 'stream of commerce'— even with the expectation that the product will reach the forum state—is enough to establish personal jurisdiction."

Brigade (UK) asserted that its principal place of business is in the United Kingdom and that it "does not conduct any business activity in Texas." It attached the affidavit of its corporate representative, Philip Hanson-Abbott, who testified that Brigade (UK) is not authorized to do business in Texas and does not have a registered agent or any employees, representatives, officers, managers, or agents "currently residing in or conducting business in Texas." Also, it does not maintain an office, warehouse, address, telephone number, or bank account in Texas. Its website is used

7

only for general, untargeted advertising. The website directs visitors to its dealers for information, quotes on safety equipment, parts, and service. Brigade (UK) asserted that haling it into a Texas court would not comport with traditional notions of fair play and substantial justice because the complained-of acts and omissions occurred, if at all, entirely in the United Kingdom.

Brigade (US) asserted that it is a New York corporation, has its principal place of business in Indiana, and "does not conduct any business activity in Texas." It attached the affidavit of its chief executive officer, Corey Heniser, who testified that Brigade (US) is not authorized to do business in Texas and does not have a registered agent or any employees, representatives, officers, managers, or agents "currently residing in or conducting business in Texas." It does not maintain an office, warehouse, address, telephone number, or bank account in Texas. Heniser also testified that that the Brigade website is used only for general, untargeted advertising. Brigade (US) asserted that haling it into a Texas court would not comport with traditional notions of fair play and substantial justice because the complained-of acts and omissions occurred, if at all, in New York or Indiana.

In their combined supplement, Brigade (UK) and Brigade (US) asserted that they did not solicit the Port's business. Rather, the Port learned about the BBS alarms through the Port's own consultant, HFP, whom the Port retained to evaluate potential noise-abatement measures. In early 2005, the Port asked Brigade (UK) to

come to Houston to demonstrate the alarms. Brigade (UK) did not provide advice on the use or risks of the alarms in any specific operating environment. The Port then purchased four alarms from Brigade (UK) "for further testing." And, HFP performed the assessment. Morgan attended a meeting at the Port in November 2005 about purchasing BBS alarms. Subsequently, the Port elected to purchase BBS alarms for its facility. Because the Port wanted a United States distributor to ensure equipment availability, it purchased the alarms through its existing supplier, Medsafe. Medsafe purchased the alarms from Brigade (US). Appellants attached HFP's acoustical study and excerpts of the depositions of Charlie Jenkins, a senior director at the Port, and of Morgan, for Brigade (UK) and Brigade (US).

In their response, appellees asserted that the Texas trial court has specific jurisdiction over Brigade (UK) and Brigade (US) because the jurisdictional facts demonstrate that they placed the subject alarm into the stream of commerce and purposefully targeted Texas as a market for the alarm, as follows:

1. Brigade participated in product demonstrations at the Port . . . ;

2. Brigade provided test units to the [Port] ultimately leading to the Brigade alarms being purchased and used in the [Port], including the alarm [at issue];

3. Brigade provided information about the efficacy and suitability of its alarms for use in the [Port];

4. Brigade met with the [Port] to provide information about the Brigade alarms ultimately to facilitate the sale of the Brigade alarms to the [Port] . . . ;

9

5. Brigade created a distributorship with Medsafe (a Texas limited partnership) to have a local company represent and sell the Brigade alarms. . . ;

6. Brigade is the sole source for manufacture and sale of the type of alarms they marketed to the [Port] . . . ;

7. Brigade easily sold over 700 alarms to the [Port] . . . ;

8. There were four Brigade alarms installed on the crane involved in the accident that resulted in the death of [the decedent.]

Appellees further asserted that Brigade used its sales to the Port in its marketing materials. Appellees attached the depositions of Morgan and Jenkins, Medsafe's price quote, the Port's purchase request and order, a product insert, a Brigade (US) ledger of Texas sales, and a Brigade press release, website page, and advertisement.

The trial court denied the special appearances.

**Personal Jurisdiction**

In their sole issue, appellants argue that the trial court erred in denying their special appearances because appellees' failed to meet their initial burden to plead jurisdictional allegations that would support jurisdiction and because appellants' jurisdictional evidence negates appellees' allegations.

**A.      Standard of Review and Guiding Legal Principles**

A court may assert personal jurisdiction over a nonresident defendant only if the requirements of both the Fourteenth Amendment's due process clause and the Texas long-arm statute are satisfied. *See* U.S. CONST. amend. XIV, § 1; TEX. CIV. PRAC. & REM. CODE § 17.042; *Guardian Royal Exch. Assurance, Ltd. v. English*

10

*China Clays, P.L.C.*, 815 S.W.2d 223, 226–27 (Tex. 1991). The Texas long-arm statute allows a court to exercise personal jurisdiction over a nonresident defendant who does business in Texas. TEX. CIV. PRAC. & REM. CODE § 17.042. A nonresident "does business" in Texas if it, inter alia, "contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part" in Texas or it "commits a tort in whole or in part" in Texas. *Id.* The Texas Supreme Court has repeatedly interpreted this statutory language "to reach as far as the federal constitutional requirements of due process will allow." *Guardian Royal*, 815 S.W.2d at 226. Thus, the requirements of the Texas long-arm statute are satisfied if the exercise of personal jurisdiction comports with federal due process limitations. *Id.*

The United States Constitution permits a state court to assert personal jurisdiction over a nonresident defendant only if the defendant has some minimum, purposeful contacts with the state and if the exercise of jurisdiction will not offend traditional notions of fair play and substantial justice. *Dawson-Austin v. Austin*, 968 S.W.2d 319, 326 (Tex. 1998). A nonresident who has purposefully availed itself of the privileges and benefits of conducting business in the state has sufficient contacts with the state to confer personal jurisdiction. *Guardian Royal*, 815 S.W.2d at 226.

The Texas Supreme Court has characterized the "purposeful availment" requirement as the "touchstone of jurisdictional due process." *Michiana Easy Livin'*

11

*Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005). In *Michiana*, the court articulated three important aspects of the purposeful availment inquiry. *Id.* at 785. First, only the defendant's contacts with the forum count. *Id.* This ensures that a defendant is not haled into a jurisdiction solely by the unilateral activities of a third party. *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). Second, the acts relied on must be purposeful; a defendant may not be haled into a jurisdiction solely based on contacts that are "random, isolated, or fortuitous." *Id.* Third, a defendant "must seek some benefit, advantage, or profit by 'availing' itself of the jurisdiction" because "[j]urisdiction is premised on notions of implied consent" and by "invoking the benefits and protections of a forum's laws, a nonresident consents to suit there." *Id.* (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

A defendant's contacts with a forum can give rise to either general jurisdiction or specific jurisdiction. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575–76 (Tex. 2007). If the defendant has made continuous and systematic contacts with the forum, general jurisdiction may be established whether or not the defendant's alleged liability arises from those contacts. *Id.* at 575. In contrast, when specific jurisdiction is alleged, the focus of the minimum-contacts analysis is on the "relationship among the defendant, the forum [,] and the litigation." *Id.* at 575–76 (quoting *Guardian Royal*, 815 S.W.2d at 228).

12

Here, only specific jurisdiction is alleged. Specific jurisdiction is established if the defendant's alleged liability arises from or is related to an activity conducted within the forum. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 796 (Tex. 2002). To constitute the minimum contacts required for a Texas court to exercise specific personal jurisdiction over a nonresident defendant: (1) the defendant's contacts with Texas must be purposeful, as discussed above, and (2) the cause of action must arise from or relate to those contacts. *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 558–59 (Tex. 2018). For a cause of action to arise from or relate to purposeful forum contacts, "there must be a substantial connection between those contacts and the operative facts of the litigation." *Moki Mac*, 221 S.W.3d at 585.

A trial court determines a special appearance "on the basis of the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony." TEX. R. CIV. P. 120a(3); *see Touradji v. Beach Capital P'ship, L.P.*, 316 S.W.3d 15, 23 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ("The plaintiff's original pleadings, as well as its response to the defendant's special appearance, can be considered in determining whether the plaintiff satisfied its burden.").

The plaintiff bears the initial burden of pleading allegations sufficient to bring a nonresident defendant within the provisions of the Texas long-arm statute. *Am.*

*Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 807 (Tex. 2002). If the plaintiff fails to plead facts bringing the defendant within reach of the long-arm statute (i.e., for a tort claim, that the defendant committed tortious acts in Texas), the defendant need only prove that it does not live in Texas to negate jurisdiction. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658–59 (Tex. 2010). If the plaintiff meets its initial burden, then the burden shifts to the nonresident to negate the plaintiff's alleged bases of jurisdiction. *Id.* at 658.

> The defendant can discharge its burden
>
> on either a factual or legal basis. Factually, the defendant can present evidence that it has no contacts with Texas, effectively disproving the plaintiff's allegations. The plaintiff can then respond with its own evidence that affirms its allegations, and it risks dismissal of its lawsuit if it cannot present the trial court with evidence establishing personal jurisdiction. Legally, the defendant can show that even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the defendant's contacts with Texas fall short of purposeful availment; for specific jurisdiction, that the claims do not arise from the contacts; or that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction.

*Id.* at 659.

We review a trial court's determination of a special appearance de novo. *Moki Mac*, 221 S.W.3d at 574. The existence of personal jurisdiction is a question of law, which must sometimes be preceded by the resolution of underlying factual disputes. *Michiana*, 168 S.W.3d at 790–91; *Predator Downhole Inc. v. Flotek Indus., Inc.*, 504 S.W.3d 394, 401 (Tex. App.—Houston [1st Dist.] 2016, no pet.). In a special

14

appearance, the trial court is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Predator Downhole*, 504 S.W.3d at 402. We will not "disturb a trial court's resolution of conflicting evidence that turns on the credibility or weight of the evidence." *Id.* When, as here, the trial court does not issue findings of fact or conclusions of law with its ruling, all fact findings necessary to support the judgment and supported by the evidence are implied. *Marchand*, 83 S.W.3d at 795.

## B.    Specific Jurisdiction[8]

### 1.    *Jurisdictional Allegations*

Appellants assert, as they did in their special appearance, that appellees did not meet their initial burden to plead sufficient allegations to bring appellants within the provisions of the Texas long-arm statute. *See* TEX. CIV. PRAC. & REM. CODE § 17.042; *Am. Type Culture Collection*, 83 S.W.3d at 807 (plaintiff bears initial burden to plead allegations sufficient to bring nonresident within provisions of Texas long-arm statute).

Again, the Texas long-arm statute "authorizes the exercise of jurisdiction over a nonresident defendant who does business in Texas." *Perna v. Hogan*, 162 S.W.3d 648, 652 (Tex. App.—Houston [14th Dist.] 2005, no pet); *see* TEX. CIV. PRAC. &

---

[8]    Because appellees concede in their response that they allege only specific, and not general, jurisdiction over appellants, we confine our analysis accordingly. *See George v. Deardorff*, 360 S.W.3d 683, 688 (Tex. App.—Fort Worth 2012, no pet.).

15

REM. CODE § 17.042. A nonresident that has purposefully availed itself of the privileges and benefits of conducting business in Texas has sufficient contacts with the state to confer personal jurisdiction. *See Guardian Royal*, 815 S.W.2d at 226. The statute provides, as relevant here, that a nonresident does business in Texas if it "commits a tort in whole or in part in this state." TEX. CIV. PRAC. & REM. CODE ANN. § 17.042(2).

In *Huynh v. Nguyen*, the court held that the plaintiff satisfied its initial burden by pleading that the defendant had "conducted business in Texas and committed torts in Texas." 180 S.W.3d 608, 619–20 (Tex. App.—Houston [14th Dist.] 2005, no pet.). "There is no requirement that plaintiffs or other claimants plead in their petition the theories or bases of personal jurisdiction upon which they rely; rather, the only relevant pleading requirement flows from the need to plead allegations sufficient to bring nonresident defendants within the provisions of the long-arm statute." *Id*. at 619. This minimal pleading requirement is satisfied by an allegation that the nonresident defendants are doing business in, or have committed any act in, Texas. *Id*. at 619–20; *see also Horizon Shipbuilding, Inc. v. BLyn II Holding, LLC*, 324 S.W.3d 840, 847 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (holding plaintiff's allegation that defendants committed torts in Texas was sufficient to bring defendants within long-arm statute). Thus, here, appellees' were required to plead that Brigade (UK) and Brigade (US) committed a tortious act in Texas. *See Kelly*,

16

301 S.W.3d at 659; *Waterman Steamship Corp. v. Ruiz*, 355 S.W.3d 387, 403 (Tex. App.—Houston [1st Dist.] 2011, pet. denied).

In their live petition,[9] and in their response to the special appearances,[10] appellees named Brigade (UK) and Brigade (US) each as a defendant, and thereafter referred to them collectively as "Brigade Electronics." Appellees alleged that Brigade Electronics and its employees were negligent in marketing the BBS alarms in Texas as suitable for use at the Port, when it fact they were not; in failing to warn the Port about the appropriate placement and settings of BBS alarms on RTG cranes; and in failing to use ordinary care in discharging their duties as a manufacturer and seller of dangerous products. And, these acts and omissions were a proximate cause of the decedent's death in Texas and of appellees' damages.

Appellees note that Brigade Electronics traveled to Texas three times to market its BBS alarms to the Port and facilitate sales, participated in product demonstrations at the Port in Texas, "conducted extensive product testing" at the Port in Texas, made representations at the Port in Texas about the efficacy and

---

[9]   After Dehaney (the original plaintiff) filed her Fourth Amended Petition on March 14, 2019, she joined the Third Amended Petition in Intervention filed by Jefferson and Irby. Thus, the Third Amended Petition in Intervention, filed on May 30, 2019, was the live petition before the trial court at the time of its November 27, 2019 ruling on the special appearances.

[10]  *See Touradji v. Beach Capital P'ship, L.P.*, 316 S.W.3d 15, 23 (Tex. App.— Houston [1st Dist.] 2010, no pet.) (considering plaintiff's pleadings and response to defendant's special appearance in determining whether plaintiff met burden).

17

suitability of its BBS alarms for use on RTG cranes, sold and directly delivered alarms to the Port in Texas, and created and maintained a contract with a Texas distributor, Medsafe, for the purpose of selling its alarms in Texas.

Appellees also alleged that Brigade Electronics defectively designed the BBS alarms, so as to render them unreasonably dangerous; that a safer alternative design existed, which Brigade Electronics failed to adopt; and that the defect was a producing cause of the decedent's death in Texas.[11]

Thus, appellees' alleged that Brigade Electronics, i.e., Brigade (UK) and Brigade (US), committed tortious acts, in whole or in part, in Texas. *See VIA Metro. Transit v. Meck*, No. 18-0458, 2020 WL 3479509, at *9 (Tex. June 26, 2020) (negligence); *Robins v. Kroger Co.*, 982 S.W.2d 156, 160 (Tex. App.—Houston [1st Dist.] 1998, no pet.) (products liability). We conclude that appellees met their initial burden to plead sufficient allegations to invoke jurisdiction over Brigade (UK) and Brigade (US) under the Texas long-arm statute. *See* TEX. CIV. PRAC. & REM. CODE § 17.042; *Am. Type Culture Collection*, 83 S.W.3d at 807; *Horizon Shipbuilding*, 324 S.W.3d at 847 (holding plaintiff's allegation that defendants committed torts in Texas was sufficient to bring defendants within long-arm statute).

---

[11]     The elements of a products liability claim alleging a design defect are that (1) the product was defectively designed so as to render it unreasonably dangerous; (2) a safer alternative design existed; and (3) the defect was a producing cause of the injury for which the plaintiff seeks recovery. *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex. 2009).

18

On appeal, appellants argue for the first time that appellees' allegations are insufficient to support jurisdiction "due to improper group pleading that attempts to assign the same alleged instance of conduct" to both Brigade (UK) and Brigade (US). They assert that appellees do not identify which of the named Brigade defendants is the subject of each of their allegations. For instance, "[m]ultiple entities cannot have made the same sale to MedSafe." And, "[t]hus, Brigade was not required to provide evidence disproving jurisdictional allegations and the special appearance should have been granted on that basis alone."

Generally, when a case involves multiple defendants, the plaintiff must specify, and the court must examine, "each defendant's actions and contacts with the forum separately"; the defendants' contacts cannot be aggregated. *Morris v. Kohls-York*, 164 S.W.3d 686, 693 (Tex. App.—Austin 2005, pet. dism'd); *see Calder v. Jones*, 465 U.S. 783, 790 (1984). "The requirements of *International Shoe* . . . must be met as to each defendant over whom a state court exercises jurisdiction." *Rush v. Savchuk*, 444 U.S. 320, 331–32 (1980).

However, appellants do not direct us to any point in the record in which they raised this issue in the trial court. The failure to preserve a due-process complaint in the trial court results in waiver of the issue on appeal. *See In re L.M.I.*, 119 S.W.3d 707, 711 (Tex. 2003); *see also Burger King*, 471 U.S. at 472 n.14 ("[T]he personal

19

jurisdiction requirement is a waivable right . . . ."); *In re Fisher*, 433 S.W.3d 523, 532 (Tex. 2014) ("Objections to personal jurisdiction may be waived.").

Moreover, in *Carey v. State*, two defendants, the Careys, asserted that the State's jurisdictional allegations were insufficient because they improperly referred to all four defendants named in the suit as an aggregate group and failed to specify which alleged acts were committed by which defendants. No. 04-09-00809-CV, 2010 WL 2838631, at *1, 4 (Tex. App.—San Antonio July 21, 2010, pet. denied) (mem. op.). There, as here, the plaintiff specifically named each defendant in its petition, including each of the Careys, and thereafter referred to all of them collectively as "Defendants" in stating the allegations. *Id.* at *4. The court concluded that the allegations, when considered together and liberally construed, asserted that the Careys committed fraudulent business practices in Texas, i.e., committed torts, which was all that was required under the Texas long-arm statute. *Id.* at *5 (citing *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004) (holding that courts liberally construe pleadings in favor of pleader when determining whether pleader alleged sufficient facts to confer jurisdiction)).

Further, if a pleading is wholly devoid of jurisdictional facts, the plaintiff should amend the pleading to include the necessary factual allegations, *see* TEX. R. CIV. P. 63, thereby allowing jurisdiction to be decided based on evidence rather than on allegations. *Kelly*, 301 S.W.3d at 659. Thus, even were we to conclude that

appellees' allegations are insufficient, the remedy would be a remand to the trial court. *See, e.g.*, *Energy Search Co. Inc. v. RLI Ins. Co.*, No. 14-18-00747-CV, 2019 WL 6711427, at *3 (Tex. App.—Houston [14th Dist.] Dec. 10, 2019, no pet.) (mem. op.) (remanding, in part, based on plaintiff's failure to plead sufficient facts to confer jurisdiction over defendants).

### 2. *Jurisdictional Facts*

We next consider whether Brigade (UK) and Brigade (US) met their burden to present evidence negating the alleged bases for personal jurisdiction.[12] *See Kelly*, 301 S.W.3d at 659. And, if so, whether appellees responded with their own evidence affirming their allegations. *See id.*

Again, the purposeful-availment analysis first considers whether a defendant's contacts with the forum were "random, isolated, or fortuitous" and whether the defendant sought some "benefit, advantage, or profit by availing itself of the jurisdiction." *Moki Mac*, 221 S.W.3d at 575. "It is the quality and nature of

---

[12] Generally, we determine specific jurisdiction on a claim-by-claim basis. *See Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274–75 (5th Cir. 2006) (specific jurisdiction is claim-specific inquiry because "the Due Process Clause prohibits the exercise of jurisdiction over any claim that does not arise out of or result from the defendant's forum contacts"); *see, e.g.*, *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 660 (Tex. 2010) (addressing jurisdictional allegations for fraud claim separately from trust-fund claims). However, we need not assess a defendant's contacts on a claim-by-claim basis when, as here, all claims essentially arise from the same forum contacts. *See Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150–51 (Tex. 2013); *Touradji*, 316 S.W.3d at 26. We discuss the facts related to Brigade (UK) and Brigade (US) together because the facts are intertwined. *See* TEX. R. APP. P. 47.1.

the defendant's contacts, rather than their number, that is important." *Am. Type Culture Collection*, 83 S.W.3d at 806.

"[A] seller's awareness 'that the stream of commerce may or will sweep [its] product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State." *See Spir Star AG v. Kimich*, 310 S.W.3d 868, 873 (Tex. 2010) (internal quotations omitted); *see also Asahi Metal Indus. Co., Ltd. v. Super. Ct. of Cal.*, 480 U.S. 102 (1987) (plurality opinion). "Instead, our precedent generally follows Justice O'Connor's plurality opinion in *Asahi*, which requires some 'additional conduct'—beyond merely placing the product in the stream of commerce—that indicates 'an intent or purpose to serve the market in the forum State.'" *Spir Star AG*, 310 S.W.3d at 873 (quoting *Asahi*, 480 U.S. at 112, and citing *Moki Mac*, 221 S.W.3d at 577, and *Michiana*, 168 S.W.3d at 786). Such "additional conduct" might include: (1) designing the product for the market in the forum State, (2) advertising in the forum State, (3) establishing channels for providing regular advice to customers in the forum State, and (4) marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. *Asahi*, 480 U.S. at 112; *Spir Star AG*, 310 S.W.3d at 873. A seller who reaches out beyond one state and creates continuing relationships with residents of another state is subject to the specific jurisdiction of the latter in suits arising from those activities. *Michiana*, 168 S.W.3d at 785.

### a. *Brigade (UK)*

Appellees assert that Brigade (UK) has sufficient minimum contacts with Texas because, as pertinent here, it:

- traveled to Texas three times to market BBS alarms to the Port
- demonstrated a BBS alarm on an RTG crane at the Port in Texas
- "conducted extensive product testing" at the Port in Texas
- made representations at the Port in Texas about the efficacy and suitability of its BBS alarms for use on RTG cranes
- sold and directly delivered alarms to the Port in Texas
- "created a distributorship with Medsafe (a Texas limited partnership) to have a local company represent and sell the Brigade alarms"

In its special appearance, Brigade (UK) asserted that its jurisdictional evidence negates appellees' allegations that it purposefully directed acts toward Texas. *See Kelly*, 301 S.W.3d at 659. Appellees asserted in their response that their evidence in rebuttal establishes that the exercise of jurisdiction was proper. *Id.*

There is no jurisdictional evidence that Brigade (UK) designed the BBS alarms for the Texas market. *See Asahi*, 480 U.S. at 112; *Spir Star AG*, 310 S.W.3d at 873.

With respect to appellees' allegations that Brigade (UK) traveled to Texas three times to market its BBS alarms to the Port, demonstrated a BBS alarm on an RTG crane at the Port in Texas, conducted product testing, made representations at the Port about the efficacy and suitability of the alarms for use on RTG cranes, and

23

sold and directly delivered BBS alarms to the Port, Brigade (UK) asserts that it did not initiate any of these contacts and that these actions were precipitated by requests from the Port or HFP. Further, it did not conduct product testing or provide information about the efficacy or suitability of the BBS alarms for use in any specific Port operations. In support, Brigade (UK) attached HFP's report and excerpts of the depositions of Morgan and of the Port's corporate representative, Charlie Jenkins.

Morgan testified that, in May 2005, at the invitation of either the Port or HFP, he traveled to Texas and performed a demonstration at the Port of the BBS alarm's capabilities. He testified that the unit was "tested" on a leg of an RTG crane. And, the demo resulted in the sale of four alarms for further evaluation. At the time, Brigade (US) was in its early stages of formation as a business entity, and was not yet functional, and Brigade (UK) did not yet have a relationship with Medsafe. Accordingly, Brigade (UK) shipped the alarms directly from the United Kingdom to the Port. He testified that the Port's consultant, HFP, then performed testing and analysis. In November 2005, Morgan attended a meeting at the Port, at which various Port personnel discussed whether to purchase the BBS alarms. In February 2006, after the Port had decided to purchase the alarms, Morgan traveled to Texas to thank Jenkins for the sales and "just to reinforce the relationship because there are plenty of other things that we supply into ports."

Jenkins also testified that the Port first learned about Brigade (UK) through its consultant, HFP. In 2005, in constructing the Bayport terminal, the Port retained HFP to assist with the federal permitting requirements. As part of the project, HFP evaluated potential noise-mitigation measures and identified the BBS alarm as one of the options. Jenkins testified that Brigade (UK) provided or sold four BBS alarms to the Port for evaluation. The alarms were installed on an RTG crane, and HFP and the Port performed evaluations with a number of stakeholders, including contractors and crane operators. Jenkins noted that the Port did not involve vendors because of the potential for bias. Similarly, the Port did not look to Brigade (UK) to perform a suitability or risk assessment with respect to using the alarms on its RTG cranes. The decision in 2006 to purchase the BBS alarms involved the Port, contractors, and skilled trades, with the final decision by the Port Commission.

Brigade (UK)'s decisions to travel to Texas three times to demonstrate its BBS alarms on an RTG crane at the Port and to market its BBS alarms, and its other products, to the Port were purposeful and not simply random or fortuitous. *See Moki Mac*, 221 S.W.3d at 575; *see also Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 340 (Tex. 2009) (concluding that defendant went "well beyond answering a phone call from a Texas resident or shipping goods to Texas"); *Smart Call, L.L.C. v. Genio Mobile*, 349 S.W.3d 755, 765 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (holding "decision to travel to Texas to conduct business can

25

only be classified as a purposeful act, and not random, fortuitous, or attenuated"). The trial court could have reasonably concluded that Brigade (UK) sought a "benefit, advantage, or profit by availing itself of the jurisdiction." *See Moki Mac*, 221 S.W.3d at 575; *see also Predator Downhole*, 504 S.W.3d at 402 (noting trial court is sole judge of witnesses' credibility and weight to be given testimony). Thus, by purposefully conducting business in Texas, with a Texas resident, Brigade (UK) purposefully availed itself of the privilege of conducting business in Texas. *See Max Protetch, Inc. v. Herrin*, 340 S.W.3d 878, 887 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (holding defendant who voluntarily came to Texas and purposefully conducted business with Texas resident "crossed a bright line and purposefully availed itself of the privilege of conducting business in Texas").

With respect to appellees' allegation that Brigade (UK) "*created* a distributorship with Medsafe (a Texas limited partnership) to have a local company represent and sell the Brigade alarms," Brigade (UK) asserted that Medsafe "was an existing supplier to the Port." (Emphasis added.) In support, Brigade (UK) pointed to Morgan's testimony. In the cited testimony, however, Morgan states: "I can't remember . . . . So my guess is Medsafe were already supplying the Port, became aware of the opportunity, and then approached us but that is my best guess." "Evidence that is so slight as to make any inference a guess is in legal effect no evidence." *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 795 (Tex. 2006).

26

Brigade (UK) also points to Jenkins's testimony that the Port "requested Brigade to have a U.S. distribution company or distributor so that [it] had more [assurance] of availability of equipment." This supports *appellees'* allegation. Appellees' evidence shows that Jenkins also testified that Port operations "requested from Brigade a U.S. supplier to ensure [that the Port] had viability of supply, and *Brigade provided Medsafe*." (Emphasis added.) Morgan further testified that Medsafe became an "authorized dealer" in "late 2005," that the purpose of establishing a relationship with Medsafe was to facilitate the Port sale, and that Brigade extended Medsafe a line of credit to facilitate the purchase and sale of Brigade's products. Morgan noted that Medsafe was an "authorized dealer" for replacement parts and that it provided support for Brigade products to Houston customers. And, once Medsafe was in place, Brigade (US), also created in 2005, became the supplier. Appellees' evidence also includes Brigade's product instructions, which direct Brigade customers to its suppliers to address questions.

Marketing through a distributor who has agreed to serve as the sales agent in the forum and establishing channels for providing regular advice to customers there constitutes "additional conduct"—beyond merely placing the product into the stream of commerce—indicating "an intent or purpose to serve the market in the forum State." *See Asahi*, 480 U.S. at 112; *see Spir Star AG*, 310 S.W.3d at 873.

27

In *Semperit Technische Produkte Gesellschaft M.B.H. v. Hennessy*, a drilling rig worker was killed when a high-pressure hydraulic hose failed. 508 S.W.3d 569, 572 (Tex. App.—El Paso 2016, no pet.). The plaintiffs sued STP, the Austrian hose manufacturer, and SIP, its New Jersey subsidiary that distributed the hose. *Id*. 572–73. STP argued that its contacts with the forum did not fit the stream of commerce "plus factors" in *Asahi Metals* because it did not design a product for Texas, did not advertise in Texas, did not develop regular communication channels with Texas customers, and did not have a distributor who agreed to serve as the sales agent in Texas. *Id.* at 579. The court of appeals concluded: "While we may agree that the facts of this case do not squarely fit into the examples offered by *Asahi Metals*, we don't perceive those four examples to be exclusive of the kind of factors that guide this question." *Id.* The court concluded that the "plus factor" present there was that STP had established a sales subsidiary in New Jersey, had targeted Texas, through its president visiting potential customers, and had participated in a "distribution network that in fact ha[d] resulted in STP selling millions of dollars of goods to Texas customers." *Id.* The volume of sales "elevate[d] this case beyond the 'random,' fortuitous,' or 'attenuated' contacts alluded to in *Burger King*." *Id.* at 579–80 (citing *Burger King*, 471 U.S. at 475–76). In affirming the denial of STP's special appearance, the court concluded that these factors demonstrated purposeful availment of the Texas marketplace. *Id*. at 580, 587.

28

Here, like in *Hennessy*, the "plus factor" is the distribution network that Brigade (UK) set up in 2005, with respect to Brigade (US) and Medsafe, and that, since 2005, has resulted in selling "easily over" 700 BBS alarms to the Port and "hundreds of thousands of dollars" in products in Texas. *See id*. at 579–80. As the *Michiana* court acknowledged, a single *contract* can give rise to personal jurisdiction when the *contract* "involves many *contacts* over a long period of time," as here. 168 S.W.3d at 787 (emphasis added). The contacts of "[s]ellers who reach out beyond one state and create continuing relationships and obligations with citizens of another state" are purposeful rather than fortuitous. *Id.* at 785. When, as here, the evidence shows that a nonresident defendant "has created continuing obligations" between itself and residents of the forum, the nonresident defendant "manifestly has availed [itself] of the privilege of conducting business there." *See Burger King*, 471 U.S. at 475–76. And, because such defendant's activities are "shielded by 'benefits' and 'protections' of the forum's laws, it is presumptively not unreasonable to require [it] to submit to the burdens of litigation in that forum as well." *Id*. at 476.

On appeal, Brigade (UK) again asserts that its contacts with the Port "were the result of a Texas resident's actions—and were thus fortuitous and not purposeful." It asserts that the Port "initiated contact with Brigade," "sought to have Brigade come to the Port to demonstrate its products," and "directed Brigade to create a distribution arrangement with Medsafe." It asserts that "the party who

29

instigated the contacts . . . is in fact crucial . . . to determining whether the contact was purposeful on behalf of Brigade" and is a "central legal issue in this case."

Courts have held that the issue of "who initiated contact" and the frequency of solicitations is important in determining whether a defendant purposefully availed itself of the forum in a buy-sell case. *See Peters v. Top Gun Exec. Grp.*, 396 S.W.3d 57, 69 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (citing *Michiana*, 168 S.W.3d at 784 (holding no purposeful availment when, inter alia, the sale was initiated entirely by resident-buyer who called nonresident-seller)). However, this factor is "less influential on the analysis when the parties . . . anticipate a long-term commercial relationship involving multiple contacts," as occurred in this case. *See id.* (citing *H. Heller & Co. v. La.-Pac. Corp.*, 209 S.W.3d 844, 852 (Tex. App.— Houston [14th Dist.] pet. denied) (finding personal jurisdiction even though resident-buyer initiated contact with nonresident-seller because transaction involved multiple sales between parties)).

We conclude that Brigade (UK) purposefully availed itself of the privilege of conducting activities in Texas. *See Retamco Operating*, 278 S.W.3d at 340.

We next consider whether there is a sufficient relationship between Brigade (UK)'s contacts with Texas and the cause of action. *See id.* That is, we consider whether the alleged liability of Brigade (UK) arises from or relates to its activity conducted within Texas. *See Bell*, 549 S.W.3d at 558 (holding that minimum

contacts for exercise of specific personal jurisdiction require that defendant's contacts with forum be purposeful and that cause of action arises from or relates to those contacts); *Marchand*, 83 S.W.3d at 796. It is not sufficient that a defendant merely have a role in a chain of events. *See Michel v. Rocket Eng'g Corp.*, 45 S.W.3d 658, 671 (Tex. App.—Fort Worth 2001, no pet.) (noting that "generalized 'but for' relationship between the forum and a non-resident defendant falls far short of meeting the requirement for specific jurisdiction"). Rather, for a cause of action to arise from or relate to purposeful forum contacts, "there must be a substantial connection between those contacts and the operative facts of the litigation." *Moki Mac*, 221 S.W.3d at 585.

Appellees assert product liability and negligence claims. They allege that the alarms were not fit for the purpose of adequately warning those in proximity of the danger of an approaching crane; the alarms were defectively designed because they did not operate at a sufficient frequency and decibel level; there was a foreseeable risk that the alarms would fail to warn the decedent of the danger of the oncoming crane; the risk could have been reduced or avoided with a safer alternative design, which Brigade Electronics failed to adopt; and Brigade Electronics was negligent in marketing the BBS alarms for use at a marine port.

The issue of whether defects in the design, and negligence in the application, of the four BBS alarms on the RTG crane at issue caused a failure to adequately

31

warn the decedent of the oncoming crane and contributed to his death are operative facts in this litigation, and Brigade (UK)'s contacts in marketing the BBS alarms on an RTG crane in Texas and selling its BBS alarms to the Port in Texas are directly related. Thus, Brigade (UK)'s contacts, discussed above, are substantially connected to the operative facts of the litigation. *See Nogle & Black Aviation, Inc. v. Faveretto*, 290 S.W.3d 277, 284 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (holding "issue of whether negligence in the design and inspection of the wing spar modification . . . caused the wing separation on the accident aircraft [was] an operative fact in [the] litigation . . . ." and contacts with Texas were directly related); *see also World–Wide Volkswagen*, 444 U.S. at 297 ("[I]f the sale of a product of a manufacturer . . . is not simply an isolated occurrence, but arises from the efforts of the manufacturer . . . to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others.").

Finally, when, as here, a nonresident defendant has purposefully established minimum contacts with the forum state, "[o]nly in rare cases" will the exercise of jurisdiction not comport with fair play and substantial justice." *Guardian Royal*, 815 S.W.2d at 231. To evaluate this component, we consider Brigade (UK)'s contacts in light of:

(1)  the burden on the defendant;

32

(2)    the interests of the forum state in adjudicating the dispute;

(3)    the plaintiff's interest in obtaining convenient and effective relief;

(4)    the interstate or international judicial system's interest in obtaining the most efficient resolution of controversies; and

(5)    the shared interest of the several nations or states in furthering fundamental substantive social policies.

*Id.* To defeat jurisdiction, Brigade must present "a compelling case that the presence of some consideration would render jurisdiction unreasonable." *Id.*

Here, Brigade (UK), in its special appearance, asserted that the Texas trial court's exercise of jurisdiction in this case would be unreasonable "because it has not done anything to purposefully avail itself of the benefits of conducting business" in Texas and because the "acts and omissions alleged against [it] occurred entirely in the United Kingdom, if at all." We concluded above that Brigade (UK) purposefully availed itself of the benefits of conducting business in Texas and that the alleged acts and omissions occurred in Texas. Brigade (UK) did not, in its special appearance, otherwise address the factors above. *See id.* Thus, we have no other basis for concluding that an exercise of jurisdiction would violate traditional notions of fair play and substantial justice.

In sum, Brigade (UK) did not merely place its products into a stream of commerce that happened to carry them to Texas. *See Spir Star AG*, 310 S.W.3d at 880. Rather, Brigade (UK) physically entered the jurisdiction with the purpose of selling its product to the Port and established a new distributor relationship to

33

facilitate long-term sales. Thus, Brigade (UK) "intended to serve the Texas market." *See id.* And, its potential liability arises out of its contacts with Texas. *See Moki Mac*, 221 S.W.3d at 585. Finally, exercising personal jurisdiction over Brigade (UK) does not offend traditional notions of fair play and substantial justice. *See Guardian Royal*, 815 S.W.2d at 231. We conclude that the pleadings and jurisdictional evidence establish the trial court's jurisdiction over Brigade (UK). We hold that the trial court did not err in denying its special appearance.

### b. *Brigade (US)*

In its special appearance, Brigade (US) asserted that the jurisdictional evidence negates appellees' allegations. *See Kelly*, 301 S.W.3d at 659. Appellees asserted in their response that their evidence in rebuttal established that the exercise of jurisdiction was proper. *See id.*

Appellees' alleged that Brigade (US) "maintained a Texas distributor, Medsafe, for the purpose of selling its alarms in Texas over time," and Brigade (US) has sold hundreds of alarms to the Port through Medsafe.

Brigade (UK), above, asserted in its special appearance that the Port ordered BBS alarms through Medsafe and that "Medsafe would have purchased the alarms from Brigade Electronics, Inc.," i.e., Brigade (US). Brigade (UK) stated: "Only one of the defendants, Brigade Electronics, Inc., [Brigade (US)] sold the alarms to

34

another company [Medsafe], who in turn sold them to the Port of Houston Authority."

Morgan testified that, after Brigade (UK) made two sales of alarms to the Port for evaluation, all of the sales to the Port that followed were by Brigade (US), through its Texas distributor, Medsafe. Morgan noted that Medsafe was an "authorized dealer" for replacement parts and that it provided support for Brigade products to Houston customers. Appellees' evidence includes Brigade's product instructions that accompany the alarms, which directs Brigade customers to its suppliers to address any questions. Appellees also presented a February 2006 price quote that Medsafe sent to the Port for approximately 260 alarms; a March 27, 2006 Request for Port Commission Action; and an April 2006 Purchase Order by the Port, to Medsafe, for $75,000.00. Morgan testified that, "[o]ver a period of time," the Port purchased "hundreds" of alarms. Appellees presented a 36-page spreadsheet of Brigade (US) sales in Texas, including to Medsafe. It reflects that sales from Brigade (US) to Medsafe began in 2005 and continued through 2012. Morgan testified that, since 2005, Brigade (US) has sold "hundreds of thousands" of dollars in products to Texas customers.

Morgan noted that, beginning in late 2005, Brigade (US) employed a sales representative, Vance Fellers, who was assigned a sales territory consisting of eastern Texas, including the Port. Fellers had a price list, maintained alarms for

customer evaluations, could accept orders from end users, and could set up new distributorships, with approval by Brigade (US). Morgan noted that the "accounts always buy directly from" Brigade (US), and "[t]he agent is there to try and make sure the accounts keep buying from us."

Again, marketing a product through a distributor who has agreed to serve as the sales agent in the forum constitutes "additional conduct"—beyond merely placing the product into the stream of commerce—that indicates "an intent or purpose to serve the market in the forum State." *See Asahi*, 480 U.S. at 112. By marketing the BBS alarms through a distributor who has agreed to serve as the sales agent in Texas, Brigade (US) has met *Asahi*'s "additional conduct standard." *See Spir Star AG*, 310 S.W.3d at 875 ("[B]y marketing [its] product through a distributor who has agreed to serve as the sales agent in the forum state, AG has met *Asahi*'s additional conduct standard." (internal quotations omitted)). A single contract can give rise to personal jurisdiction when the contract "involves many contacts over a long period of time," as here. *Michiana*, 168 S.W.3d at 787. And, the contacts of "[s]ellers who reach out beyond one state and create continuing relationships and obligations with citizens of another state" are purposeful rather than fortuitous. *Id.* at 785.

Further, appellees' claims arise from, or are related to, Brigade (US)'s Texas contacts. *See Moki Mac*, 221 S.W.3d at 585 (holding that, "for a nonresident

36

defendant's forum contacts to support an exercise of specific jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation"); *Marchand*, 83 S.W.3d at 796 (holding specific jurisdiction is established if defendant's alleged liability arises from or is related to activity conducted within forum). Again, Brigade (UK) asserted, and Morgan testified, that after Brigade (UK) made two sales of alarms to the Port for evaluation, *all of the sales* to the Port that followed were by Brigade (US), through its Texas distributor, Medsafe. Thus, the trial court could have reasonably concluded that the alarms at issue were sold to the Port by Brigade (US). The issue of whether negligence in the application of the four BBS alarms on the RTG crane at issue caused a failure to adequately warn the decedent of the oncoming crane and contributed to his death are operative facts in the litigation, and Brigade (US)'s contacts in selling the very alarms at issue, through its authorized distributor, to the Port in Texas are directly related. Thus, Brigade (US)'s contacts are substantially connected to the operative facts of the litigation. *See Hennessy*, 508 S.W.3d at 584.

Again, when, as here, a nonresident defendant has purposefully established minimum contacts with the forum state, "[o]nly in rare cases" will the exercise of jurisdiction not comport with fair play and substantial justice. *Guardian Royal*, 815 S.W.2d at 231. To evaluate this component, we consider Brigade (US)'s contacts in light of:

(1)    the burden on the defendant;

(2)    the interests of the forum state in adjudicating the dispute;

(3)    the plaintiff's interest in obtaining convenient and effective relief;

(4)    the interstate or international judicial system's interest in obtaining the most efficient resolution of controversies; and

(5)    the shared interest of the several nations or states in furthering fundamental substantive social policies.

*Id.* To defeat jurisdiction, Brigade (US) must present "a compelling case that the presence of some consideration would render jurisdiction unreasonable." *See id.*

Here, Brigade (US), in its special appearance, asserted that the Texas trial court's exercise of jurisdiction in this case would be unreasonable "because it has not done anything to purposefully avail itself of the benefits of conducting business" in Texas and because the "acts and omissions alleged against [it] occurred entirely in New York or Indiana, if at all." We concluded above that Brigade (US) did purposefully avail itself of the benefits of conducting business in Texas and appellees allege acts and omissions that occurred in Texas. Moreover, Brigade (US) did not, in its special appearance, address any of the *Guardian Royal* factors above. *See id.* Thus, here again, we have no basis for concluding that exercise of jurisdiction would violate traditional notions of fair play and substantial justice.

In sum, Brigade (US), like its counterpart, did not merely place its products into a stream of commerce that happened to carry them to Texas. *See Spir Star AG*, 310 S.W.3d at 880. Rather, it maintained a distributor relationship to facilitate long-

38

term sales. Thus, Brigade (US) "intended to serve the Texas market." *See id.* And, its potential liability arises out of its contacts with Texas. Finally, exercising personal jurisdiction over Brigade (US) does not offend traditional notions of fair play and substantial justice. We conclude that the pleadings and jurisdictional evidence establish the trial court's jurisdiction over Brigade (US). We hold that the trial court did not err in denying its special appearance.

We overrule appellants' sole issue.

## Conclusion

We affirm the trial court's order denying the special appearances of Brigade (UK) and Brigade (US).


Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Hightower and Adams.